Michael QUARTARARO, Petitioner,

v.

Robert HANSLMAIER, Superintendent,
Woodbourne Correctional Facility,
Respondent.

No. 94–CV–5564 (JS).

United States District Court,
E.D. New York.

Nov. 30, 1998.

Henriette D. Hoffman, The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, NY, for Petitioner.

James M. Catterson, Jr., District Attorney of Suffolk County by Steven A. Hovani, Assistant District Attorney, Riverhead, NY, for Respondent.

## MEMORANDUM AND ORDER

SEYBERT, District Judge.

Petitioner Michael Quartararo petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking to set aside his conviction for the 1979 murder of thirteen year-old John Pius. The initial charges alleged that Petitioner, along with his older brother Peter Quartararo, Thomas Ryan, and Robert Brensic, murdered Pius by shoving rocks down Pius' throat, ultimately suffocating him. After a careful and exhaustive review of the extensive record in this matter, the Court concludes that Michael Quartararo's petition must be granted.

## FACTUAL BACKGROUND

### PRIOR PROCEEDINGS

Following a jury trial with his brother Peter that drew considerable public attention, Michael Quartararo was first convicted of Pius' murder in 1981. On June 9, 1981, Petitioner was sentenced as a juvenile to an indeterminate term of incarceration of nine years to life. Petitioner appealed his conviction to the Appellate Division, Second Department, which affirmed the conviction. *People v. Quartararo*, 113 A.D.2d 845, 493 N.Y.S.2d 511 (2d Dep't 1985). Leave to appeal to the New York Court of Appeals was denied. *People v. Quartararo*, 66 N.Y.2d 1042, 499 N.Y.S.2d 1040, 489 N.E.2d 1312 (1985).

In 1988, United States District Judge Edward R. Korman granted Petitioner's application for a writ of habeas corpus on the ground of ineffective assistance of counsel. *Quartararo v. Fogg*, 679 F.Supp. 212 (E.D.N.Y.), *aff'd*, 849 F.2d 1467 (2d Cir.1988). Specifically, Judge Korman found that Petitioner's counsel was constitutionally deficient because he failed to object to highly prejudicial and inadmissible evidence, failed to object to a "grossly improper and inflammatory" prosecutorial summation, failed to make an opening statement, and made his own "incompetent summation." *Id.* at 248. This

decision was heightened by the judge's determination that the evidence against Petitioner, apart from the inadmissible evidence to which his counsel did not object, was "exceedingly weak." *Id.* at 249. However, in a footnote, the judge rejected Petitioner's claim of insufficient evidence under the governing test set forth in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560, (1979). *See id.* at 214 n. 3.[1]

Despite such "exceedingly weak" evidence, Petitioner was retried in 1990, and again was convicted of second degree murder. On May 30, 1990, Petitioner again was sentenced to an indeterminate term of incarceration of nine years to life, with a recommendation from the sentencing judge that parole not be considered until fifteen years had been served. Petitioner received credit for time served following the first conviction. The Appellate Division affirmed the conviction.[2] *People v. Quartararo*, 200 A.D.2d 160, 612 N.Y.S.2d 635 (2d Dep't 1994). Leave to appeal to the New York State Court of Appeals was denied on November 1, 1994. *People v. Quartararo*, 84 N.Y.2d 939, 621 N.Y.S.2d 536, 645 N.E.2d 1236 (1994). This *pro se* petition for habeas corpus followed on December 8, 1994.[3]

The conviction of Peter Quartararo, who was tried jointly with Michael in 1981, also was affirmed and leave to appeal was denied. Judge Korman, however, granted Peter's petition for a writ of habeas corpus on the ground that his confession was involuntary.[4] *Quartararo v. Mantello*, 715 F.Supp. 449, 466 (E.D.N.Y.), *aff'd*, 888 F.2d 126 (2d Cir.1989). Following the issuance of the writ, Peter Quartararo was not retried because there was insufficient evidence linking him to the murder.

Robert Brensic was convicted following a jury trial in 1983. His conviction was affirmed by the Second Department in 1986. *People v. Brensic*, 119 A.D.2d 281, 506 N.Y.S.2d 570 (2d Dep't 1986). Nevertheless, the conviction was overturned by the New York Court of Appeals on the ground that Peter Quartararo's confession was improperly admitted into evidence against Brensic. *See People v. Brensic*, 70 N.Y.2d 9, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (1987). On remand, Brensic's request for a change of venue was granted, but he pled guilty to manslaughter in the second degree prior to trial.[5] According to the papers submitted with this petition, Brensic is now out on parole.

---

1. No analysis was conducted because the judge found that it was not necessary to address the insufficiency claim since the ineffective assistance of counsel claim was so strong. 679 F.Supp. at 214. Additionally, the judge pointed out that "the quality of the evidence and the limited inferences that can be drawn from it make this a very weak case." *Id.* at 214 n. 3 (internal citations omitted). In particular, the court highlighted its discomfort with the evidence regarding Petitioner's intent to commit murder in the second degree, calling the issue "extremely close." *Id.* at 250.

2. Petitioner filed a civil rights action under 42 U.S.C. § 1983 on September 2, 1993, prior to the affirmance of his conviction by the Second Department. The complaint alleged that Petitioner's constitutional rights had been violated by his removal from a work release program, and by the denial of his parole applications. *See Quartararo v. Catterson*, 917 F.Supp. 919 (E.D.N.Y. 1996). That case is still pending before this Court.

3. Counsel was appointed for Petitioner on December 15, 1994. This petition was re-assigned to the undersigned judge on June 13, 1995. Because the original petition contained both ex-

hausted and unexhausted claims, on July 28, 1995 the application was dismissed without prejudice to re-file only the exhausted claims. The case was re-opened on August 15, 1995. Eight days later, the Court granted Petitioner's motion to abandon any unexhausted claims. Oral argument was held on November 6, 1995.

4. Two years previously, on the appeal of a related case, the New York Court of Appeals had held that Peter Quartararo's confession was unreliable. *See People v. Brensic*, 70 N.Y.2d 9, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (1987).

5. Brensic's plea agreement contained several unusual provisions. Petitioner's Supplemental Appendix in Support of Petition, at 65. First, he received a promise from the prosecution that he would not be called as a witness in any of the related trials or proceedings. *Id.* at 82. Second, the district attorney agreed that he would not oppose immediate parole. *Id.* at 81. Third, Brensic was promised that the Pius family would drop its civil suit against him. *Id.* at 83–85. Fourth, Brensic himself agreed that he would not bring a civil action against Suffolk County. *Id.* at 85–86. Finally, the plea bargain covered all charges, known and unknown, against Brensic. *Id.* at 89.

The last co-defendant, Thomas Ryan, was tried and convicted in 1983. His conviction was affirmed on appeal. *People v. Ryan,* 121 A.D.2d 34, 509 N.Y.S.2d 545 (2d Dep't 1986). However, following the determination that Peter Quartararo's confession was unreliable, the Appellate Division on rehearing overturned Ryan's conviction. *People v. Ryan,* 134 A.D.2d 300, 520 N.Y.S.2d 528 (2d Dep't 1987). Following a mistrial in his second trial, Ryan subsequently was retried a third time in Suffolk County, after his motion to change venue was denied. *People v. Ryan,* 151 A.D.2d 528, 542 N.Y.S.2d 665 (2d Dep't 1989). He was convicted of second degree murder on May 20, 1990. Because Ryan was an adult at the time of the murder, he was sentenced to twenty-five years to life. Ryan's leave to appeal to the Court of Appeals was denied on August 21, 1995. *People v. Ryan,* 86 N.Y.2d 801, 632 N.Y.S.2d 515, 656 N.E.2d 614 (1995). Ryan's petition for a writ of habeas corpus is presently pending before this Court.

## THE EVIDENCE INTRODUCED AT TRIAL

At Petitioner's second trial, the prosecution advanced the theory that Pius had witnessed the four co-defendants steal a motorless minibike, and out of fear that Pius would report them to the police, the four killed Pius by beating him and shoving stones down his throat, subsequently burying his body in the woods behind the Dogwood Elementary School. T. 1145–56.

### A. The Murder and Investigation

At about 8:15 p.m. on April 20, 1979, John Pius, Jr. asked his father for permission to ride his bicycle up to the Dogwood Elementary School. T. 75–76. His father told him to come back in about fifteen minutes. T. 76 Pius was last seen at about 8:25 p.m., as he was bicycling out of the driveway of his home. T. 461–62. There was no evidence of the route Pius traveled to the Dogwood Elementary School, but it usually took approximately five minutes to bicycle the quarter of a mile from the Pius home to the school. T. 402, 405.

When Pius had not returned home by 9:30 p.m., his father went to look for him at the school grounds. T. 76, 128. He continued to search for his son on and off throughout the night, calling out his name. T. 128. On two occasions, Eddie Pembroke, Pius' friend and neighbor, accompanied Mr. Pius. T. 78, 411–14, 437. The next morning, Mr. Pius was informed that his son's wallet had been found in the playground of the Dogwood Elementary School. T. 80. Mr. Pius went to the school with some family members. T. 81. His niece spotted Pius' bicycle partially buried under leaves at the bottom of the hill. T. 81. Mr. Pius stood it up against a tree. T. 81–82. At about 1:30 p.m., Pius' body was discovered buried beneath leaves, branches and logs. T. 83–84, 488, 496. Six rocks were lodged in Pius' throat. T. 342. His body had multiple contusions and lacerations from being dragged across the ground. T. 336–38, 346. The primary causes of death were traumatic asphyxia and compression of the chest and neck. T. 346.

The only fingerprint on Pius' bicycle was his own. T. 378. There was no hair or fiber evidence recovered. T. 396. A diamond, "Puma"-type tread sneaker print was found on Pius' face. T. 297, 300. Additionally, there were six footprints found within the path along which the body had been dragged. T. 288, 304. None of the prints at the scene or on Pius' face matched any of the sneakers and shoes taken from the four defendants. T. 301–02. The only match was with Eddie Pembroke's sneakers. T. 299–300. The police did not take sneakers from the initial suspects—John Sparling, Michael O'Neil and Raymond St. Dennis—or from any other potential suspects (except the four defendants) to compare with the impressions obtained from footprints at the scene and on Pius' face. T. 207, 301–02, 666–67.

According to Dr. Carlos Tejo, the Medical Examiner, the death occurred in a twelve-hour period from 3:45 p.m. on April 20th to 3:45 a.m. on April 21st. T. 345. Thus, according to the forensic evidence, Pius could have been killed as late as seven hours after he was last seen alive at 8:25 p.m., riding from his home. T. 345–46, 353.

To support its theory that Pius was murdered at approximately 8:35 p.m., the prose-

cution elicited the testimony of John Bailey, whose residence was adjacent to the school. Bailey was then fourteen years old. T. 519, 529. The prosecution also introduced a stipulation as to the testimony of an elderly woman, Mrs. Calia, who had been babysitting at the Bailey residence on the evening of April 20, 1979. T. 611. Beginning about 8:15 p.m., both Bailey and Calia heard the Bailey's dog, which was outside in the backyard, barking intermittently for fifteen to twenty minutes. T. 523–25, 611–12. Mrs. Calia also heard commotion and voices, but did not recognize them and could not distinguish the words. T. 610–12. The two never investigated to determine why the dog was barking. T. 531. The prosecution argued that evidence of the dog barking from about 8:15 p.m. through 8:35 p.m. proved that the death occurred during that time period, the commotion surrounding the beating and killing of Pius being the reason the dog was barking. T. 523–24, 610–12, 1155–56.

John Sparling, then seventeen years old, testified that at about 7:50 p.m., he and his two friends had walked from the Smithtown beer distributor along a path that led to the Dogwood Elementary School, arriving there at about 8:15 to 8:20 p.m. T. 582–84. Earlier, while at the beer distributor, the three had met up with the defendants, who were in a yellow car driven by Thomas Ryan, in which Robert Brensic, Michael Quartararo, and Peter Quartararo were passengers. T. 536–38. Sparling and his friends sold them a six-pack of beer. T. 537. Sparling noticed a water bong in the car, but no one was smoking pot at that time. T. 539–40. The two groups parted, but Sparling saw the same yellow car again at about 8:15 or 8:20 p.m. at the Dogwood Elementary School. T. 546. Robert Brensic was on a minibike and was holding on to the driver's side of the car. T. 546. Sparling did not see who else, if anyone, was in the car. T. 608–09. The car left the school property, proceeded down Dogwood Drive, and turned right onto Rice Lane. T. 547. Sparling testified that he never saw Pius that night. T. 591–92.

The investigation into Pius' death came to focus on the four defendants after Sparling told Detective Thomas Gill, who was investigating the homicide, that he had seen Brensic and a yellow car up at the elementary school on the night of April 20, 1979. R. 643. Detective Gill testified that after interviewing Sparling, he met with Michael Quartararo, Peter Quartararo, Thomas Ryan and Robert Brensic on April 25, 1979. T. 643. When Detective Gill asked them where they had been on the night of April 20, they said they had been at the High School East watching a baseball game. T. 645–47. However, Gill stated that although all four of the boys were present, Brensic did most of the talking. T. 651. Gill further testified that upon investigation, he determined that there were no lights or facilities for a night game at the high school. T. 648. Gill obtained this information from the school principal, but he could not recall the principal's name. T. 658. Gill also checked with security people. T. 658–59.

**B. Petitioner's Statements at the Fourth Precinct.**

On April 28, 1979, at about 1:00 p.m., Thomas Ryan and Peter Quartararo were taken into custody. T. 737, 739. Detectives LaValle and Fountain took Ryan to the Homicide Squad office, while Detective Jensen took Peter Quartararo to the Fourth Precinct Juvenile Service Unit. T. 739. Detectives Palumbo and Leonard joined Jensen with Peter at the Fourth Precinct. T. 739–40. After the three detectives consulted with each other, Palumbo and Leonard questioned Peter Quartararo. T. 760. Jensen then returned to the Homicide Squad Office, where Ryan was detained, and directed two detectives to find Robert Brensic, who was brought to the Homicide Squad Office at about 3:45 p.m. T. 740.

Later that same day, April 28, Petitioner arrived at the Fourth Precinct with his mother at about 8:30 p.m. T. 742. Jensen left Petitioner with three detectives and a police officer while he went to review the case with an Assistant District Attorney, the Lieutenant and Detective Reck. T. 742–43. Detective Palumbo, the principal interrogator, testified that when Peter, Michael and Mrs. Quartararo were all in one room, he administered all of them their *Miranda* warnings.

T. 767. After both Peter and Michael agreed to answer questions without the presence of a lawyer, Michael was taken out of the room. T. 767. After a period of time, Michael was brought back into the room with Peter, his mother, and Detective Palumbo. T. 767. At this juncture, the testimony of Detective Palumbo was elicited by the prosecutor as follows:

Q. Sometime after he [Michael] was taken out of the room, did you bring him back into the room?

A. Yes, I did.

Q. After he was brought back in to the room, did you then say something to him? Just yes or no. Did you say something to him?

A. Yes, I did.

Q. As a result of what you said to him, did Michael Quartararo say something?

A. Yes, he did.

Q. What did he say?

A. "I don't know what you're talking about."

Q. After he said that, was something else said to him in the room. Yes or no.

A. Yes, there was.

Q. And as a result of what was said to him, did he then say something?

A. Yes, he did.

Q. What did he say?

A. He said, "All I did was drive around with them that night drinking beer."

Q. After that was something else again said to him? Just yes or no.

A. Yes, sir.

Q. And after that was said to him, did he say something else in response to that?

A. Yes he did.

Q. What did he say?

A. He said, "You cops don't have anything on me. All I did was drive around with them drinking beer and I

helped them steal the minibike." He said, "The only thing you got me for is stealing a minibike, not killing John Pius."

T. 767–68. Detective Palumbo then testified that following this exchange, Mrs. Quartararo asked that Mr. Quartararo be contacted to come to the precinct. T. 769.

Despite this testimony by Palumbo, that he had said "something" to the Petitioner three different times, the testimony was, in fact, not truthful. Detective Palumbo was forced to testify in such a contrived manner because the prosecution was unable to elicit the fact or details of Peter's confession, since it previously had been determined unreliable by the New York Court of Appeals.[6] Additionally, the confession was ruled involuntary by another judge of this Court.[7] Judge Thomas V. Mallon, who presided at Petitioner's trial, stated on the record that he was very uncomfortable with this testimony, because it was so carefully tailored to maneuver around the impermissible confession. *See* discussion at T. 699–730.

The prosecutor explained to the trial judge that although the statements attributed to Petitioner were made by him, in the presence of and in response to a confession by his brother Peter, no reference would be made either to the substance of this confession or the fact that it was made. The prosecutor pointed out to the judge the actual nature of the conversation and events in a lengthy discussion held outside the presence of the jury.

The prosecutor reviewed the detective's proposed testimony as follows:

[J]ust so you know, what happens is Michael is taken out of the room. Peter then is told, "Tell your mother what you just told us." And he proceeds to tell his mother about the killing of John Pius. Michael is then brought back in. And Palumbo then asks Michael to tell what happened the night of the 20th. And he [Michael] says things to the extent of, "I don't know what my brother is talking about. I have nothing to do with it." Peter then says to

**6.** *See People v. Brensic*, 70 N.Y.2d 9, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (1987).

**7.** *See Quartararo v. Mantello*, 715 F.Supp. 449 (E.D.N.Y.), *aff'd* 888 F.2d 126 (2d Cir.1989).

him, "Michael, I just told him everything. Tell the truth. I already told them that we killed John Pius," or words to that effect. His [Michael's] response is then to Palumbo, "I don't know what my brother is talking about. I drank beer with those guys. I rode around in the car with them. We stole a minibike. I don't know what my brother is talking about past that though." Again, words to that effect. Again Peter says, "Michael, please. I told them everything. I told them that we killed John," whatever. At which time Michael says to Palumbo, "Hey, I don't know what he's talking about. All you cops got me for is stealing a minibike. I had nothing to do with killing Pius."

T. 701–02.

The prosecutor then asked the court to direct him how to handle Peter's statements to Michael, because Michael's statements were, in fact, made in response to what Peter said. T. 702. The judge responded:

Believe me, you're asking for guidance from the Court. I can't give you any guidance. I'm—this is not a play. We're not directing a play or anything else here. And I'm not going to direct how the testimony comes in. But in some shape, manner or form, if you're going to try to get these statements of Michael's in, they may have to come in a vacuum. They may very well have to come in in a vacuum.

T. 703–04.

The discussion continued. The judge offered a solution by asking the prosecutor, in reference to Peter's statements, "Couldn't you have it look like Palumbo saying it?" T. 711. The prosecutor responded, "But he didn't. The answer would be no. The truth is, 'I didn't say something.' Was something said then to Michael? How about that. 'Was something said to Michael?'" T. 711–12. Petitioner's trial counsel responded, "Who said it? The snowman? It's obvious Peter said it." T. 712. The prosecutor argued that it would not be so obvious, but expressed frustration that the facts were being changed in an attempt to overcome the taint of Peter's confession. The prosecutor protested, "Let's make a whole different scenario how this happened. And they'll have

something that totally didn't happen at all. . . . There comes a time when facts, things that actually happened that we cannot avoid—we can redact. Certain limits. But we cannot change facts. So to say, 'Detective Palumbo, did you then say something?' His answer would be, 'No, I didn't.'" T. 712.

The judge suggested that a curative instruction to the jury might lessen any fears that the jurors would speculate about the conversation, and that he could instruct them not to consider anything against Petitioner other than his own words. T. 715–17. Judge Mallon recognized that the entire conversation was problematic, as was the wrangling to avoid trial error. The judge stated at one point, "We asked for a jury of 12 people to sit here and listen to the evidence and make a decision based on the evidence. We're changing the evidence. And I feel quite—rather uncomfortable being a party to that." T. 717. Defense counsel continued to suggest that a redaction, which would avoid any reference to Peter, would be appropriate. T. 717.

The discussion continued for several more pages of the transcript. The trial judge stated that he was "not going to orchestrate the testimony of the witness. That's for damn sure." T. 722. The court also recognized that "Here you have a witness [Palumbo] who is sworn to tell the truth, is going to be testifying to what is not the truth. It didn't happen." T. 726. As the testimony began to take shape, the court mentioned to the prosecutor that "You're going to have to lead him. You're going to have to testify. There is no question about it." T. 729.

In sum, therefore, Palumbo's testimony did not occur in the manner in which he testified. The detective was not the person who said "something" to Petitioner. The "something" that was said to Petitioner was said to him by Peter. In turn, the statements made by Petitioner were made in response to Peter's confession. Thus, although Palumbo testified that he himself had said "something" to the Petitioner to elicit these statements, this testimony factually was untrue.

Nevertheless, the day following the events at the Fourth Precinct, on April 29, 1979, the

police went to the Quartararo residence and collected both brothers' shoes and a minibike frame that had been stolen from Philip Pfister's yard. T. 747–49, 751, 754. The police also took sneakers belonging to the two brothers from their school gym lockers. T. 752. At the same time, rumors of the involvement of the Quartararo brothers and others began circulating in the community. T. 788, 906. The murder was a common topic of conversation among residents of Smithtown. T. 847, 864, 868, 888.

The only other evidence offered against Petitioner consisted of two statements he made to friends, the first in July or August of 1979, and the second made in September 1979. It is necessary to examine each of these conversations in detail as reported.

## C. Conversation at St. James Railroad Station

As to the first incident, the jury heard testimony from five of Petitioner's friends who were drinking beer with him one evening in the summer of 1979 behind the feed store near the St. James Railroad Station. Each of the five boys—James Burke, John McCort, Danny Culotta, Michael Burke and David O'Brien—testified as to their version of the statements Petitioner made. None of the youths could remember exactly when the conversation occurred, or how long the conversation lasted. However, the testimony of each was comparatively similar to that of the others. T. 774–826 (J. Burke); 841–877 (McCort); 878–897 (Culotta); 897–912 (M.Burke); 915–933 (O'Brien).

### 1. Testimony of James Burke

James Burke, then fourteen years old, and at the time of trial a Suffolk County police officer, testified that the conversation occurred between 7:00 and 8:00 p.m., in late July or early August 1979. T. 776–77. Following a conversation about the funeral mass for John Pius, James Burke testified as follows:

Q. After the discussion of the funeral mass took place, was Michael Quartararo asked a question?

A. Yes, he was, sir.

Q. What was he asked?

A. Danny Culotta asked him who killed Pius.

Q. And how did he respond?

A. He said, "Ask Brensic."

Q. Was he then asked another question?

A. Yes, he was.

Q. By Michael Quartararo? [sic]

A. Yes, he was.

Q. What was he asked?

A. Danny Culotta asked him, "How could you kill someone for just stealing a minibike?"

Q. And how did he respond to that, Michael Quartararo?

A. Michael Quartararo said, "If you were drunk and stoned, and you didn't want to get caught, you would do the same thing."

Q. After he made that statement, did Michael Quartararo say anything else in your presence that you recall?

A. From my recollection, I recall that Michael had realized what he had said—

Mr. Cohen: Objection, your Honor.

Q. Not what he realized. Just tell us what he said.

The Court: Sustained.

A. Mike said Pius seen them steal the bike, the minibike. And he didn't touch the kid. All he did was put the bike against the tree.

T. 780–81.[8] James Burke also testified that he had not been drinking, but that Petitioner and Culotta were drinking. T. 791, 793. He could not recall if McCort, O'Brien, or his brother Michael Burke were drinking. T. 793–94. He testified that he was present at the railroad station for approximately thirty to sixty minutes that evening. T. 793.

---

**8.** At the first trial in 1981, James Burke testified that the question asked of Michael Quartararo had been "How could *someone* kill a kid for just stealing a minibike?" *Fogg,* 679 F.Supp. at 226 (emphasis added).

## 2. Testimony of John McCort

John McCort was fifteen years old in 1979. T. 842. He testified that the conversation at the railroad station took place in late July or early August, at around 7:30 or 8:00 p.m. T. 844, 850. McCort testified that he, Culotta, Michael Burke, and Michael Quartararo had been drinking beer. T. 850–51. He also testified that he was there for a couple of hours. T. 850. McCort's testimony was elicited as follows:

Q. And at some point during the conversation was Michael Quartararo asked a question?

A. Yes.

Q. Do you remember what the question was?

A. No, I don't.

Q. Do you remember what Michael Quartararo said in response to a question being asked of him?

A. Yes.

Q. What did he say?

A. He said he felt sorry for what had happened. He also mentioned putting John's bike against the tree while those guys beat him up.

Q. Did he indicate to you where this took place?

A. Saint—Dogwood Elementary School.

Q. Did he indicate who he was with?

A. No.

Q. Meaning the other guys, who the other guys were?

A. No, he didn't.

Q. Do you remember him answering a question as to why it had taken place?

A. Yes.

Q. What did he say?

A. "If you were drunk enough and didn't want to get caught, you'd do the same thing."

T. 844–45.

On cross-examination, McCort added more detail to his testimony:

Q. Now, you said that during this conversation Michael said that he put a bicycle up against a tree; is that correct?

A. Yes.

Q. And he said that's all he did; isn't that correct?

A. Yes.

Q. And he said he had no involvement in doing anything else at all, isn't that correct?

A. (No response)

Q. I don't mean those words, but the substance?

A. Yes.

T. 864. On re-direct, McCort was asked by the prosecutor, "While he was telling you about putting the bike up against the tree, what else was he saying?" McCort responded: "He said those guys were beating him up." T. 875.

## 3. Testimony of Danny Culotta

Danny Culotta testified that the conversation at the railroad station took place sometime in July, August, or September of 1979. T. 885. Culotta was fourteen years old at the time. T. 879. Culotta did not recall how long he was there that night, but estimated he was there from two to three hours to all night long. T. 880, 886–87. He also testified that he and Michael Quartararo were drinking beer, but did not recall if anyone else was drinking. T. 887–88. The relevant part of Culotta's testimony was as follows:

Q. Now, after, or during that conversation I should say, did there come a time where you asked Michael Quartararo a question?

A. Yes.

Q. What did you ask him?

A. I asked him how he could kill a kid like that, shoving rocks down his throat.

Q. And what did he say to you?

A. He said, "If you were drunk and stoned and he saw you stealing a minibike, you would do the same thing."

Q. Did Michael Quartararo indicate anything else? Did he say anything else to you and the others about the murder of John Pius that night?

A. He said that John Pius saw him putting the minibike in the back of Tommy Ryan's car.

T. 881. However, on cross-examination, Culotta phrased his question to Petitioner differently than he did on direct examination.[9] Culotta testified:

A. I remember asking Michael, "How do you kill a kid like that by shoving rocks down his throat?" And his reply, what he said.

Q. His reply?

A. Yeah.

Q. You don't remember that the words you just used were the exact words that you used during this conversation, do you?

A. No, they were exact, I'd say.

Q. You remember that?

A. Yes.

T. 889. Later in his testimony, still on cross-examination, Culotta testified as follows:

Q. And when the conversation took place, this conversation about the death of John Pius, you didn't have any particular reaction to what Michael told you, did you?

A. No, I did not.

Q. You didn't hear it with your ears as a confession, did you?

A. I didn't take it as a confession, no. I did not.

. . . .

Q. And do you remember Michael saying at any point, "Ask Brensic"?

A. I don't recall that, no.

Q. Okay. And do you remember Michael saying at any point that he put a bicycle against a tree?

A. Yes. I do remember that.

Q. You do?

A. Yes. He said he didn't do nothing but put a bicycle up against the tree. Put the bicycle up against the tree.

. . . .

Q. He also told you he had nothing to do with the Pius murder; isn't that correct?

A. He said he didn't do anything. That's all he did, was put the bike up against the tree.

T. 890–93.

4. Testimony of Michael Burke

Michael Burke testified that the conversation occurred in late July or early August, between 7:00 and 8:00 p.m. T. 903–04, 900. He was thirteen years old at the time of the conversation. T. 899. Michael Burke stated that the group was at the train station that night for two to three hours, and that they regularly hung out there five out of seven nights a week. T. 903, 900. Michael Burke testified that he drank two or three beers that night, and that Petitioner and Culotta also were drinking. T. 900, 902. He was unable to recall who else was drinking. T. 902. Michael Burke's testimony was as follows:

Q. Did there come a time, after arriving at the area of the St. James Railroad Station that night, that a conversation took place about the death of John Pius?

A. Yes, there did.

Q. And during that conversation did there come a point when Michael Quartararo was asked a question?

A. Yes.

Q. Do you remember what the question was?

A. Yes, I do.

Q. What was the question?

A. Danny had asked him, "How could you kill someone for just stealing a minibike?"

Q. And do you remember what Michael Quartararo said?

A. Yes. He said, "If you were drunk and stoned and you didn't want to get caught, you would have probably done the same thing."

"How could you kill a kid like that." *Fogg,* 679 F.Supp. at 227.

---

9. Moreover, at Petitioner's first trial in 1981, Culotta testified that he had asked Petitioner

Q. Did he indicate anything else about the murder of John Pius?

A. Yes. Well, he talked a little bit after that. He said that he had seen John Pius in the Dogwood area that night when they had possession of the minibike.

Q. Did he indicate who they were, who he was with?

A. Yes, he was with his brother Peter, Robert Brensic and Thomas Ryan.

T. 900–01.[10]

5. Testimony of David O'Brien

David O'Brien, then fifteen years old, also was present at the St. James Railroad Station that night. T. 916. Unlike the others, O'Brien did not live in the area; he lived in Connecticut and was visiting his friend John McCort. T. 916–18. O'Brien testified that the conversation occurred between 7:00 and 8:00 p.m., in late July or early August. T. 917, 919. He recalled that the group was there for two to three hours. T. 927. His testimony was as follows:

Q. At some point while you were there that night, did there come a time when a conversation began about the death of a boy by the name of Johnny Pius?

A. Yes, there was.

Q. And at some point after the conversation began, did there come a time when Michael Quartararo said something about the death of Johnny Pius?

A. Yes, he did.

Q. Can you tell us what you recall Michael Quartararo saying?

A. He said that they were stealing a minibike. And that this boy John had seen them stealing the minibike. And that they were going to—that he was going to call the police. Then they chased after him and caught up to him. And they had stepped on him, beat him up, punched him and kicked him.

Q. Did they—I'm sorry. Go ahead.

A. And then he said that he took the bike and put it some place.

. . . .

Q. Do you recall anything else that Michael Quartararo said?

A. (No response)

Q. About what had happened to Johnny Pius?

A. No, sir. I can't recall.

Q. Now, you mentioned, in fact you used the word they. Did he ever tell you, or anybody else at that time, who they were?

A. No, sir.

Q. Never mentioned any other names?

A. No.

T. 919–21. O'Brien also testified that several of the group were drinking, and that he didn't recall if there was anyone who was not drinking. T. 924. He had a couple of beers. T. 924. He testified that he believed that Petitioner, James Burke, Michael Burke and Culotta were drinking. T. 925.

None of the five boys reported these statements to their parents or the police. T. 799, 853–54, 890, 907. James Burke and John McCort testified as to having felt "shocked" by Petitioner's statements. T. 796–97, 854. Michael Burke reported being "surprised" by the conversation. T. 905. However, Michael Burke continued to hang out with Petitioner after the conversation. T. 912.

D. Conversation at St. James Elementary School

The second set of statements by Petitioner occurred in September of 1979. At that time, Petitioner was present in the field of the St. James Elementary School with James Burke, McCort and Culotta. All three testified regarding this conversation.

James Burke testified that the conversation took place in late September, but could not remember exactly where the conversation occurred. T. 782. When asked, James Burke testified that "[t]he conversation, what

---

**10.** At Petitioner's first trial in 1981, Michael Burke testified that Danny Culotta's statement to Petitioner had been, "How *you could* kill somebody for just stealing a minibike." *Fogg,* 679 F.Supp. at 226 (emphasis added).

I remember of the conversation, is Michael said that the Homicide detectives had shown him photos of Pius. And that his face, his nose was smashed off and that he was covered with leaves. In addition, Mike had said that—I asked him, I said, 'Well, are you in anymore trouble with this Pius case?' And he said, 'The pigs fucked it up and too much time had passed.'" T. 782.

John McCort recalled that Petitioner was asked "[s]omething pertaining to, 'What's happening to you?,' as far as, 'What's going on with you?'" T. 846. McCort testified that Petitioner responded: "He said that the cops had fucked up and that he probably would get off." T. 846.

Dan Culotta testified in a similar vein. Culotta stated that "[s]omebody asked Michael, 'Are you still in trouble with the police?' And he said, 'No. It's too late. The cops fucked it up. The pigs fucked it up. They'll never catch us.'" T. 881–82.

### E. The Defense Case

On behalf of the defense, Debra Dietrich, a former girlfriend of Petitioner's brother Philip, and a babysitter for his other brother Thomas, testified that she was babysitting Thomas on the night of April 20, 1979. T. 1031–32. She testified that Peter, Michael, Brensic and Ryan came into the Quartararo home between 8:30 and 8:35 p.m. that night. T. 1034–35. She remembered the time because she had just taken some brownies out of the oven that were cooling. T. 1035. Dietrich admitted that in her original police statement, she said that the boys had returned at 8:45 p.m. T. 1049. She did not see any dirt on their clothes when they returned. T. 1037.[11]

### DISCUSSION

At the time this petition was filed *pro se*, Michael Quartararo raised six grounds for

relief. Upon appointment of counsel and the determination that some of the grounds were either unexhausted or procedurally barred, the petition was amended to set forth three constitutional challenges to Petitioner's conviction. First, Petitioner alleges that his Sixth Amendment Confrontation Clause rights were violated when the prosecution introduced certain references to Peter Quartararo's confession, which even in their redacted form implied to jurors that Peter had confessed. Second, Petitioner alleges that the evidence introduced at trial was constitutionally insufficient to support his conviction for intentional murder. Third, Petitioner asserts that he was denied a fair trial because his motion for a change of venue was denied and the jury could not have been impartial because of the extensive pretrial publicity in Suffolk County preceding this case. Petitioner also claims that one juror in particular was actually biased against him prior to being seated on the jury. The Court will address each of these arguments in turn.[12]

## I. CONFRONTATION CLAUSE CLAIM

The Sixth Amendment guarantees a defendant's right to cross-examine witnesses. *Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In particular, *Bruton* held that in a joint trial, the confession of one co-defendant—which implicates both defendants—may not be introduced despite the court's limiting instruction that the confession be considered only against the confessing defendant. *Id.* at 128, 88 S.Ct. 1620. The *Bruton* rule was limited somewhat in *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), where the Supreme Court held that the Sixth Amendment is not violated where the nontestifying co-defendant's confession is admitted with a limiting instruction, if the

---

**11.** The defense also re-called Detective–Sergeant Richard Jensen to the stand, and called Detective–Sergeant Paul Fuhrmann. Jensen was questioned about the police investigation, particularly regarding the investigation into other possible suspects. T. 968–994. Fuhrmann was questioned primarily about the events surrounding the night of the murder, in particular his response to Mr. Pius having called in a missing person report to the police. T. 995–1028.

**12.** Respondent initially claimed that the Petitioner's Confrontation Clause claim was barred for failure to exhaust. *See* Respondent's Memorandum of Law, at 22–24. However, at oral argument on November 6, 1995, Respondent conceded that this claim was, in fact, exhausted. There is no dispute that the other two claims have been exhausted.

confession is redacted to eliminate both the defendant's name and any reference to his or her existence. *Id.* The present situation is, of course, considerably different than those of *Bruton* and *Richardson.*

Petitioner's first claim for relief is that the Confrontation Clause of the Sixth Amendment was violated when the prosecution improperly made reference to Peter Quartararo's involuntary and unreliable confession during the examination of Detective Palumbo. Petitioner's Memorandum of Law ("Pet. Mem."), at 63. As reproduced above, the prosecutor elicited from Detective Palumbo that, after Peter had been at the precinct for over six hours, the detective said "something" to the Petitioner while Peter and his mother were still present. Petitioner then responded, "I don't know what you're talking about." T. 767. Palumbo testified that he again said "something" to Petitioner, to which Petitioner responded, "All I did was drive around with them that night drinking beer." T. 767. After that, Palumbo testified that he said "something else" to Petitioner, after which Petitioner stated, "You cops don't have anything on me. All I did was drive around with them drinking beer and I helped them steal the minibike." Petitioner allegedly continued, "The only thing you got me for is stealing a minibike, not killing John Pius." T. 767–68.

The backroom details concerning the detective's testimony are reproduced in the Factual Background, *supra.* With the understanding that the challenged testimony was redacted, if not changed,[13] in order to avoid reference to Peter Quartararo's statements, which implicated Petitioner, the Court proceeds to the analysis of the claim.

Petitioner first asserts that, aside from the prejudicial nature of the testimony, the mere introduction and use of the detective's side of this discussion was impermissible because the statements were implied hearsay and were not admissible as "background" information. Pet. Mem., at 70. Respondent contends that it was necessary to introduce the dialogue between Petitioner and the detective in order "to complete the narrative of an incident and to *avoid* speculation by the jury

or to permit the jury to understand a sequence of events or to provide a context for the occurrence of an act." Respondent's Memorandum of Law ("Resp.Mem."), at 24 (emphasis in original).

The rules governing the introduction and use of statements made outside the confines of a courtroom are well-established but often difficult to apply. It is well-known that "[h]earsay is a statement of someone, who is not testifying under oath and subject to cross-examination at trial, which is offered in evidence to prove the truth of the matter asserted in the statement." 4 Louis R. Frumer & Eliot L. Biskind, Bender's New York Evidence, § 15.01 (1998). Respondent argues both that the statements made by Detective Palumbo were not hearsay, and that the statements were admissible as necessary background. *See* Respondent's Supplemental Memorandum of Law ("Resp.Supp."), at 23; Resp. Mem., at 24.

 Petitioner is correct in asserting that there is no "background" exception to the rule against hearsay. *United States v. Pedroza,* 750 F.2d 187, 200 (2d Cir.1984). However, statements that would be hearsay if introduced to prove the truth of the matter asserted may be admissible for other purposes, if the jury is provided a limiting instruction. *See, e.g., People v. Jimenez,* 246 A.D.2d 333, 667 N.Y.S.2d 362, 363 (1st Dep't 1998) (out-of-court statements, with limiting instructions, properly admitted as background material to assist jury in understanding events leading to defendant's arrest); *People v. Strong,* 234 A.D.2d 990, 651 N.Y.S.2d 823, 824 (4th Dep't 1996) (out-of-court statements admissible, with limiting instructions, to complete the narrative of the episode). Use of so-called "background" hearsay is further limited by the requirement that "such out-of-court statements [may] be admitted only if they address a disputed fact." *Watson v. Scully,* No. 89 Civ. 7840, 1994 WL 177286, at *9 (S.D.N.Y. May 4, 1994) (Ward, J.) (citing *People v. Casanova,* 160 A.D.2d 394, 554 N.Y.S.2d 21, 22 (1st Dep't 1990) and *People v. Hernandez,* 139

---

**13.** Neither of the parties has addressed this issue in the briefs.

A.D.2d 472, 527 N.Y.S.2d 404, 407 (1st Dep't 1988)).

A similar rule has been recognized by the Second Circuit. "When statements by an out-of-court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters with the understanding or intent with which certain acts were performed." *Pedroza*, 750 F.2d at 200. Evaluating this rule in *United States v. Harwood*, 998 F.2d 91 (2d Cir.1993), the court of appeals held that, because the reason why the police had approached the defendant was not in dispute, the offered "background" testimony was therefore irrelevant, and thus inadmissible as hearsay. *Harwood*, 998 F.2d at 99. Moreover, where there is no purpose for the background testimony except for its truth, the evidence is inadmissible as hearsay. *Pedroza*, 750 F.2d at 200. In any event, "[t]he greater the likelihood of prejudice resulting from the jury's misuse of the statement, the greater the justification needed to introduce the 'background' evidence for its non-hearsay purpose." *United States v. Reyes*, 18 F.3d 65, 70 (2d Cir.1994).

In other words, testimony that permissibly is offered to provide the jury with needed explanation or context is admissible; however, when there is no legitimate need for such background, or when the proposed testimony is highly prejudicial, or subject to misuse by the jury, the testimony is not admissible because it is, in reality, being offered to prove the truth of the matters asserted. While it may appear that this is a very fine line, the analysis really requires nothing more than traditional hearsay analysis: if offered as truth of the matter asserted, without an exception, it is inadmissible; but if offered as background, and the material is neither highly prejudicial or subject to misuse by the jury, the testimony should be admitted. *Cf.* Fed.R.Evid. 403.

Petitioner points out that the context and sequence of the conversation between he and Detective Palumbo were not needed to explain the actions or investigation of the police because, prior to Palumbo's testimony, the jury already knew why the police were questioning him on April 28. More particularly, John Sparling already had testified that he had told the police on April 24 that on the night of Pius' death, he had seen Brensic and the yellow car at the Dogwood Elementary School. T. 546. Thus, Petitioner contends, the jury already had information that John Sparling had implicated Petitioner in Pius' death. Therefore, the jury already had a basis for understanding why the police were questioning him. *Cf. Harwood*, 998 F.2d at 99 (rejecting offered "background" testimony where there was no dispute regarding the reason the police had approached the defendant). In sum, Petitioner argues that there was no purpose for the introduction of this background testimony except for the truth of the matters asserted therein. *Pedroza*, 750 F.2d at 200.

Respondent's argument that the detective's side of the conversation was necessary to provide a proper context for the jury is not persuasive given its admission that "the police already knew from Sparling that Brensic, Ryan and the Quartararo brothers were together on the evening of the murder." Resp. Supp., at 21. The key information was what Petitioner said—not the detective. Respondent nevertheless argues that the dialogue, offered in redacted form [14] through the prosecutor and Palumbo, was offered merely as "background" in order "to complete the narrative of an incident and to *avoid* speculation by the jury or to permit the jury to understand a sequence of events . . . ." Resp. Mem., at 24 (emphasis in original). In the circumstances here, none of these proffered reasons is proper. First, it was not necessary to introduce the fact that the detective said "something" to the Petitioner to complete the narrative of an incident and to avoid speculation by the jury. Through Sparling's testimony, the jury already knew why the police were questioning Petitioner.

---

**14.** The Court uses this term very broadly and with a degree of concern. *See* Factual Background, *supra*.

In fact, the introduction of the testimony in this form was more likely to lead to jury speculation regarding just what the "something" was that Detective Palumbo said to Petitioner to get him to respond the way he did. Such potential juror misuse is the precise reason for excluding "background" evidence. *See Reyes,* 18 F.3d at 70.

For the same reasons, the detective's statements were not necessary "background" that the jury needed to understand the sequence of events involved. The concept is not difficult: Sparling told the police that he saw Petitioner in the area of Dogwood Elementary School the night of the murder, and then the police sought to question Petitioner. Finally, the detective's side of the conversation, which actually was Peter's, was not necessary to provide a context for the occurrence of an act. The only context the jury needed already had been provided.

In sum, there was no permissible reason for the admission of the fact that the detective said "something" to the Petitioner. This "something," further discussed below, would only add to the prosecution's case if it were introduced as truth of the "something" asserted, a reason which converts the testimony to hearsay, and plainly is impermissible.[15] As such, the testimony of Detective Palumbo, that he said "something" to the Petitioner, was inadmissible hearsay, and should have been excluded. *See also United States v. Check,* 582 F.2d 668, 681 (2d Cir.1978) (holding that "a witness's prior statements offered to prove the truth of the matters asserted therein are not immunized from the proscriptive effect of the hearsay rule.... even if they could be regarded as being a literal

recitation of [the witness's] own prior out-of-court statements.").

■ Of course, the fact that hearsay impermissibly was introduced does not mean that a constitutional violation occurred, nor does it mean that the error was not harmless. The fact that the testimony was admitted, however, makes the question whether Petitioner's Confrontation Clause rights were violated by such introduction even more serious.

Reaching the substance of Petitioner's claims, Petitioner argues that the detective's use of the term "something" only could have referred to Peter's inadmissible confession, and the use of the word "something" was prejudicial to his defense. Pet. Mem., at 63, 66–70. Petitioner further argues that the statements he made to Palumbo could have been elicited without introducing the entire conversation with the detective, in the context of the detective's prior interrogation of Peter. *Id.,* at 71–72.

Petitioner relies primarily on the Second Circuit's decision in *Mason v. Scully,* 16 F.3d 38 (2d Cir.1994), to show that the admission of police testimony, implying that a non-testifying witness had implicated the defendant, violates the Confrontation Clause. In *Mason,* the prosecutor questioned a police officer about a conversation the officer had with a non-testifying co-defendant who previously had pled guilty to the robbery charge of which both he and defendant were accused. 16 F.3d at 39–40. The prosecutor said to the testifying officer, "[A]fter this conversation with George Rivera [the co-defendant], were you looking for somebody?" *Id.* at 40. The officer replied, "Yes, I was."

---

**15.** As suggested by Petitioner's trial counsel, Petitioner's statements could have been introduced by the prosecution in a manner which would not have necessitated the introduction of the fact that Detective Palumbo said "something" to the Petitioner. T. 725–26. The word-dance between the prosecutor and the detective could have been eliminated—and Petitioner's statements still brought out—simply by asking the detective whether he had a conversation with Petitioner about the Pius murder, and what the Petitioner said in that conversation. In this form, the testimony apparently still would have been truthful. Respondent argues that introduction of the evidence without reference to external events would

have "neutralized the probative value" of Petitioner's statements and would have invited the jury to speculate about the context of the conversation. Resp. Mem., at 27. This argument has absolutely no merit. If anything, introduction of the Petitioner's statements in this fashion would have strengthened their probative value and would have prevented jury speculation regarding what the detective said to Petitioner to elicit the statements made. Such an approach also would have eliminated, or at least minimized, the risk of a Confrontation Clause violation. Finally, Palumbo then would not have had to testify that he said "something" to the Petitioner, when in fact, he did not.

*Id.* The prosecutor followed up, "And, who were you looking for?" *Id.* The police officer replied, "Terrance Mason [the defendant]." *Id.*

In discussing defendant Mason's Confrontation Clause rights, the court of appeals found that "the statement need not have accused the defendant explicitly" in order to infringe on the defendant's confrontation rights. *Id.* at 42–43. Instead, the defendant's rights could be implicated by "an accusation that is only implicit." *Id.* at 43. Additionally, the court of appeals cited with approval the decision of the New York Appellate Division in *People v. Tufano*, 69 A.D.2d 826, 415 N.Y.S.2d 42 (2d Dep't 1979). In *Tufano*, the Second Department held that it was "'obviously improper' to create in jurors' minds the impression that a codefendant's unreported statement led to the defendant's arrest." *Mason*, 16 F.3d at 43 (quoting *Tufano*, 415 N.Y.S.2d at 43). In *Tufano*, the court held that the defendant's right to confrontation was violated when the prosecutor introduced testimony of a conversation between a police officer and a non-testifying co-defendant in order to show "that it was Terenzi's statement that led them to arrest Tufano." *Tufano*, 415 N.Y.S.2d at 43.

Petitioner's case, however, slightly differs from both *Mason* and *Tufano*. In both of the aforementioned cases, the statements of non-testifying co-defendants led to the defendants' respective arrests. The effect of the challenged statements, namely the subsequent arrests of Mason and Tufano, implied to the jury that the out-of-court statements by the co-defendants clearly implicated the defendants, leading to a violation of the defendants' right to confrontation because the declarants did not testify.

In Petitioner's case, however, the alleged confrontation problem is much less defined. Unlike the implications formed in *Mason* and *Tufano*, where the out-of-court statements

led directly to the defendants' arrests, here the "something" of which the detective testified did not lead directly to Petitioner's arrest. Instead, Palumbo's side of the conversation essentially led Petitioner to admit to stealing the mini-bike and drinking beer, but deny involvement in Pius' murder.[16] The central problem with Petitioner's argument is that the word "something," even in the context in which it was used here, is too vague to act as an implicit accusation by Peter, made via Palumbo, that Petitioner was involved in the murder.

The testimony of Palumbo indicated that the jury knew that Peter had been taken to the Fourth Precinct around 1:30 p.m. by Detective Jensen. T. 739. The jury knew that Detective Palumbo's first meeting with Peter Quartararo occurred at around 2:30 p.m. T. 760. The jury also knew that efforts were being made to bring Petitioner to the precinct. T. 741. The jury further knew that sometime after 2:30 p.m., Jensen had directed that Brensic be brought in, and that Brensic arrived around 3:45 p.m. T. 739–40. The jury knew that Petitioner arrived at the precinct with his mother at around 8:30 p.m. T. 742. The jury knew that Petitioner had been administered *Miranda* warnings[17] in the presence of his mother and Peter. T. 765–67. The jury knew that Petitioner then was removed from the room for a period of time, leaving behind the detective, Peter Quartararo, and Mrs. Quartararo. T. 767. The jury knew that Michael later was brought back into the room. T. 767. It was at this juncture that Palumbo allegedly said "something" to the Petitioner three different times, thus eliciting Petitioner's statements. T. 767–68. The jury also knew that the subject of the "something" said to the Petitioner was the Pius murder. T. 771. Nevertheless, the jury would have had to engage in a lengthy reasoning process in order to conclude that the "something" that was said to Petitioner was the fact that Peter had confessed to the crime and had implicated Peti-

16. The New York Court of Appeals, in a related case, aptly characterized Petitioner's words at the Fourth Precinct as a vehement denial of his involvement in Pius' death. *People v. Brensic*, 70 N.Y.2d 9, 18, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (1987).

17. Respondent's argument that the jury would not necessarily have concluded that Peter Quartararo was questioned by Palumbo during Michael's absence from the room is not persuasive. *See* Resp. Supp., at 21–22.

tioner. The jury would have had to string together all of this testimony, conclude that Palumbo was merely acting as a conduit for Peter, and that the "something" was an accusation of Petitioner. This type of inferential reasoning is not the sort of direct and immediate confrontation that exists in any of the cases Petitioner cites in support of his position. The line of reasoning from "something" to an incriminating statement made by somebody who did not even testify is far too long and far too speculative to support the conclusion that Petitioner would like to reach.

In further support of his claim, Petitioner points out that the jury later became aware that "something" occurred on April 28, 1979 which eliminated other suspects in the Pius murder. T. 994. Additionally, Petitioner argues that the prosecutor further highlighted that the "something" was Peter's confession when in summation he stated that he had been "unable to discuss some of the police investigation in this case." T. 1164. However, these statements, made days after Palumbo's testimony, were unlikely to increase the likelihood that the jury would conclude that the "something" about which Palumbo had testified was Peter's confession implicating Petitioner. The jury still would have had to engage in a thoughtful and deliberate process in order to get to this conclusion. Such deliberation is not similar to the type of facially incriminating statements that previously have been held to violate the Confrontation Clause.

The Supreme Court recently addressed the extent to which a *Bruton* violation occurs when a co-defendant's statement is redacted by replacing the "defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol." *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 1155, 140 L.Ed.2d 294 (1998). The Court held that redactions of this sort fall within *Bruton* 's protections, and therefore violate the Confrontation Clause. *Id.*

Despite its expansion of Confrontation Clause rights, however, *Gray* does not support Petitioner's position. Though some analogies can be made, none are persuasive because of the unique situation presented here. First, *Gray* involved a joint trial; here there was no joint trial. Second, *Gray* involved the introduction of the co-defendant's confession; here, the confession was absolutely barred from admission, despite the prosecutor's multiple attempts to get the fact or details of the confession admitted.[18] In fact, unlike in *Gray*, here the confession could not be used against anyone. These distinct facts—there was no joint trial and no introduction of a redacted confession—militate in favor of a finding that no Confrontation Clause violation occurred.

One particular passage from *Gray* is exceptionally instructive, offering a Sixth Amendment principle that cannot be overlooked. In the context of the facts presented to it, the *Gray* Court held that

> [t]he inferences at issue here involve statements that, despite redaction, obviously refer to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial. Moreover, the redacted confession with the blank prominent on its face, ... facially incriminates the codefendant. Like the confession in *Bruton* itself, the accusation that the redacted confession makes is more vivid than inferential incrimination, and hence more difficult to thrust out of mind.

*Gray*, 523 U.S. at ——, 118 S.Ct. at 1157 (internal quotations and brackets omitted).

The situation presented here does not come close to paralleling that in *Gray*. The inferences here do not obviously refer to someone and do not involve inferences that a jury would make immediately. Instead, the jury would have had to go through a rather complex reasoning process to arrive—if ever—at the conclusion that the "something"

---

**18.** For example, the prosecutor called Peter Quartararo to testify; however, the court ruled that Peter could assert his Fifth Amendment privilege against self-incrimination. T. 941–965. Additionally, the prosecutor requested that Peter be declared an unavailable witness for the purpose of introducing his 1981 trial testimony. T. 965. The court responded to this request by stating, "No way." T. 965.

was Peter's confession implicating Petitioner. While it is only natural that the jury would speculate as to what the "something" was being substituted for, Palumbo's testimony did not facially incriminate Petitioner. Even if the jury eventually arrived at this conclusion that Petitioner claims is so obvious, it is not so vivid that it would have been difficult to thrust out of mind.

In sum, although Palumbo's testimony was not admissible as "background" testimony, the error in admitting the testimony did not rise to the level of a constitutional violation. For this reason, the Court need not conduct an inquiry into the harmfulness of this evidentiary error. *See Einaugler v. Supreme Court of State of New York*, 109 F.3d 836, 842 (2d Cir.1997) ("We may only overturn a state conviction when that conviction was obtained in violation of a federal constitutional right."). Thus, the Petitioner's writ must be denied on this claim.

## II. SUFFICIENCY OF THE EVIDENCE CLAIM

Petitioner's second claim is that he was deprived of due process of law based on the prosecution's failure to prove through legally significant evidence every element of the offense beyond a reasonable doubt. Specifically, Petitioner alleges that the prosecution failed to prove that Petitioner actually took part in the murder and that he intended to murder John Pius. In support of this argument, Petitioner points out that the prosecution's case was based entirely on circumstantial evidence, including ambiguous statements by teenagers who had been drinking; that there was no physical evidence linking him to the crime; and there was inadequate police investigation of the case.

### A. Legal Standard

■ Habeas relief based on sufficiency of the evidence should be granted only if the court concludes that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The evidence must be weighed in the light most favorable to the prosecution and all permissible inferences must be drawn in the prosecution's favor. *Id.* at 326, 99 S.Ct. 2781. "This means that we must credit every inference that could have been drawn in the State's favor, . . . whether the evidence being reviewed is direct or circumstantial." *Reddy v. Coombe*, 846 F.2d 866, 869 (2d Cir.1988).[19]

■ The court must apply relevant state law to determine if "a rational juror could have found the element of intent satisfied." *Mallette v. Scully*, 752 F.2d 26, 31–32 (2d Cir.1984). However, it is not necessary to decide "whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (emphasis in original). Rather, "[t]he task is to ascertain whether the record evidence on which the trier of fact relied was of sufficient quality to support the verdict." *Mallette*, 752 F.2d at 31 (citing *Woodby v. Immigration and Naturalization Service*, 385 U.S. 276, 282, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966)). A federal court's scope of review is "the narrow one of due process, and not the broad exercise of supervisory power that [it] would possess in regard to [its] own trial court." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (citation omitted).

■ Having set such a high bar for habeas relief on an insufficiency claim, the *Jackson* Court nevertheless warned against deferring

19. Under New York law, if the evidence supporting a defendant's guilt is exclusively circumstantial, the State must "prove the accused's guilt to 'a moral certainty' and the defendant is entitled to a jury instruction, in words or substance, to that effect." *People v. Wong*, 81 N.Y.2d 600, 608, 601 N.Y.S.2d 440, 444, 619 N.E.2d 377 (1993). However, the test for appellate review of the sufficiency of the evidence is the same for both direct and circumstantial evidence. *People v. Rossey*, 89 N.Y.2d 970, 971–72, 655 N.Y.S.2d 861, 862, 678 N.E.2d 473 (1997). In this case, the trial judge instructed the jury that because only circumstantial evidence was presented, to convict it had to "exclude to a moral certainty every other reasonably hypothesis, supposition or proposition except that of guilt of the accused." T. 1215.

to convictions that were supported only by a "mere modicum" of evidence. *Jackson*, 443 U.S. at 320, 99 S.Ct. 2781. As part of its sufficiency review, this Court must consider "whether, as a matter of federal law, there was sufficient evidence for a jury to find that the prosecution proved the substantive elements of the crime as defined by state law." *Einaugler*, 109 F.3d at 839. The Second Circuit also has emphasized that

> where a fact to be proved is also an element of the offense—here, intent ..., which is usually established only by inference—it is not enough that the inferences in the government's favor are permissible. We must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt.

*United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir.1995) (citing *United States v. Soto*, 47 F.3d 546, 549 (2d Cir.1995); *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir.1994)).

It is true that a petitioner challenging the sufficiency of the evidence bears a "very heavy burden." *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.1983). The burden is very heavy because of the special concerns of federal-state comity and finality arising when "a state prisoner invokes the jurisdiction of a federal court to redress an alleged constitutional violation." *Jackson*, 443 U.S. at 322, 99 S.Ct. 2781. However, the burden cannot be so heavy that it essentially mandates denial of relief in practically *all* instances where the sufficiency of the evidence is challenged. *Id.; see also* Jon O. Newman, *Beyond "Reasonable Doubt"*, 68 N.Y.U. L.Rev. 979, 993–97 (1993) (criticizing federal courts for failing to "conscientiously assess" sufficiency of the evidence claims). Otherwise, there would be no reason for the statutory authority granted to federal courts to determine "whether state convictions have been secured in accord with federal constitutional law." *Jackson*, 443 U.S. at 323, 99 S.Ct. 2781; *see also* 28 U.S.C. § 2254. In sum, "[u]nder our system of criminal justice even a thief is entitled to

complain that he has been unconstitutionally convicted and imprisoned as a burglar." *Jackson*, 443 U.S. at 323–24, 99 S.Ct. 2781.

■ Finally, although the scope of federal review of claims of insufficiency of the evidence appears to have been further constrained by the 1996 enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), this section does not apply retroactively to non-capital habeas corpus applications that were pending when the Act was passed. *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 2061, 138 L.Ed.2d 481 (1997). This petition was filed on December 8, 1994 and thus was pending when the AEDPA was enacted. Therefore, the AEDPA does not apply to this case.

### B. Analysis of the Claim

New York State law provides the starting point in an insufficiency analysis. The Court must apply the *Jackson* standard to the "substantive elements of the crime as defined by state law." *Einaugler*, 109 F.3d at 839.

Petitioner was convicted of Murder in the Second Degree in violation of New York Penal Law § 125.25(1).[20] The indictment alleged that Petitioner, along with the three co-defendants, acted in concert to commit the crime. T. 1219. As such, the conviction was premised on Petitioner's liability for the acts of another.

Section 125.25(1) contains three elements, all of which were required to be proven beyond a reasonable doubt. First, the prosecution was required to prove that the Petitioner, acting in concert with and aided by Peter Quartararo, Robert Brensic and Thomas Ryan, beat, kicked and shoved rocks in John Pius's mouth and throat. The second element the prosecution was required to prove was that the Petitioner, acting in concert with and aided by the others, intended to cause Pius's death. And third, the prosecution was required to prove that the Petitioner's actions in concert with the others actually caused Pius's death. *See* T. 1219–21.

---

**20.** In relevant part, this section states that "[a] person is guilty of murder in the second degree when ... with intent to cause the death of another person, he causes the death of such person."

New York State law requires that to hold someone criminally liable for the act of another, the prosecution must prove not only the requisite mental culpability, but also that the defendant solicited, requested, commanded, importuned, or intentionally aided the principal in engaging in the conduct constituting the offense. N.Y. Penal Law § 20.00 (McKinney 1998). A finding of intentional conduct must be premised on proof that a person acted with a conscious objective to cause a result or engage in conduct described in the offense. N.Y. Penal Law § 15.05(1) (McKinney 1998). When culpability is premised on accomplice liability, the accomplice must share the intent of the principal actor and have taken some action that aided the principal. *People v. Bennett,* 160 A.D.2d 949, 951, 554 N.Y.S.2d 671, 672, (1990); *People v. LaBelle,* 18 N.Y.2d 405, 412, 276 N.Y.S.2d 105, 110, 222 N.E.2d 727 (1966). Mere presence at the scene of the crime, even with knowledge of the principal's illegal conduct, is not sufficient to convert the defendant into an accomplice. *People v. Reyes,* 82 A.D.2d 925, 926, 440 N.Y.S.2d 674, 675 (1981).

The evidence upon which Petitioner was found guilty is discussed in the Factual Background section, *supra.* Viewing the evidence in the light most favorable to the prosecution, and drawing all permissible inferences in the prosecution's favor, the Court finds that the evidence adduced at trial was constitutionally insufficient to prove that Petitioner murdered John Pius.

### 1. The Physical Evidence

There was no physical evidence linking Petitioner to the murder of John Pius. The only fingerprint found on Pius' bicycle was his own. T. 396. None of the six footprints found at the scene, nor the sneaker imprint left on Pius' face, matched any of the sneakers or shoes taken from Petitioner (or the other three defendants). T. 301–02. No hair or fiber evidence was recovered. T. 396. When Petitioner returned to his home on the night of the murder, at approximately 8:45 p.m., his clothes were not soiled or dirty. T. 1037.

This evidence, or lack thereof, is remarkable in light of the fact that Pius' killer or killers beat him, shoved rocks down his throat, dragged his body to the woods behind the elementary school, and then buried his body beneath dirt, leaves and logs. Despite the prosecutor's attempt to explain away the extreme lack of physical evidence, T. 1160–64, it is certain that the jury was not permitted to infer from the prosecutor's hypothesis that physical evidence did, in fact, exist at one time, and from there infer that such hypothetical evidence would have incriminated Petitioner. In sum, all of the physical evidence was exculpatory. There is no other conclusion that any rational jury could have reached based on the physical evidence presented. *Cf. Fogg,* 679 F.Supp. at 217 (discussing physical evidence presented at Petitioner's first trial).

### 2. Statements at the Fourth Precinct [21]

As already discussed extensively, *supra,* Petitioner's statements at the Fourth Precinct amounted to a confession to helping the others steal a minibike, a confession to drinking with the others, and a firm denial of his involvement in the death of John Pius. T. 767–68. In fact, the New York Court of Appeals summarized this testimony by stating that "Michael vehemently denied any involvement in the killing, although he admitted a part in the stealing of the minibike." *People v. Brensic,* 70 N.Y.2d 9, 18, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (1987). This Court concurs with the Court of Appeals in its finding that Petitioner's statements were

---

21. Both Petitioner and Respondent make lengthy arguments regarding whether Petitioner's statements constitute direct or circumstantial evidence. The New York Court of Appeals has held that where a defendant's statements concern events other than the ultimate issue to be determined by the jury, such statements are properly considered circumstantial evidence. *People v. Sanchez,* 61 N.Y.2d 1022, 1023, 475 N.Y.S.2d 376, 377, 463 N.E.2d 1228 (1984). Here, as in *Sanchez,* the Petitioner's statements "cannot be interpreted to establish the act charged." *Id.* Thus, Petitioner's statements constitute circumstantial evidence. However, regardless of how the statements are classified, this Court must analyze all evidence, both direct and circumstantial, in the light most favorable to the prosecution. *Reddy,* 846 F.2d at 869.

a vehement denial of his involvement in Pius' murder.

For purposes of this analysis, the Court finds that none of this testimony, viewed in the light most favorable to the prosecution, establishes that Petitioner had a conscious objective to cause a result or engage in conduct described in the offense charged. *See* N.Y. Penal Law § 15.05(1) (McKinney 1998). Nor does this testimony show that Petitioner solicited, requested, commanded, importuned, or intentionally aided the principal(s) in engaging in the conduct described in the offense charged. *See* N.Y. Penal Law § 20.00 (McKinney 1998). This testimony does not even show that the Petitioner was present at the scene of the murder. *See Reyes,* 82 A.D.2d at 926, 440 N.Y.S.2d at 675. While the jury was entitled to disbelieve Petitioner's reported denial,[22] such rejected testimony may not serve as the basis for the opposite conclusion. *United States v. Zimmitti,* 850 F.2d 869, 876 (2d Cir.1988). In other words, the jury was not permitted to infer that Petitioner was guilty on the basis that he proclaimed his innocence.

Respondent argues that the importance of this testimony was the fact that during this conversation, Petitioner retreated from his earlier statement that he had been at the High School East watching a baseball game the night Pius was killed. Resp. Mem., at 64; T. 645–47, 650–51, 667–71. The circumstances surrounding the earlier conversation, however, make Petitioner's supposed denial remarkably unreliable.

Detective Gill testified that on Wednesday, April 25, 1979, he met with the four defendants outside the entrance of the High School East. T. 643–44. Gill testified that he had a conversation with Petitioner, and that he asked "them" of "his" whereabouts. T. 645. Upon questioning by the court, Gill clarified that while Petitioner was present, the conversation was "with all the boys, the four of them." T. 645. Gill then testified that he asked "them" about "their" whereabouts on the night of the murder. T. 645–

46. After being instructed twice that he could testify only as to what Petitioner said, Gill nevertheless again stated that he asked the four about "their" whereabouts on April 20th, and that Petitioner "said yes, that he was at the High School East watching a baseball game that night." T. 647.

On cross-examination, Gill testified that he knew at the time of this conversation that either Brensic or Ryan was the oldest of the four boys. T. 650. He also knew that Petitioner was the youngest of the four. T. 651. Gill testified that Robert Brensic did most of the talking during this conversation, and that he never made any notes at all that identified which of the four boys said what. T. 651–52, 671. Gill also stated that he directed all his questions to the group and Brensic was the one who answered. T. 671. Gill did not direct any questions to Petitioner. T. 671.

When defense counsel questioned Gill about his prior testimony related to this matter, Gill recalled stating that the group had "acknowledged" Brensic's answers, presumably the answer that "they" had been at High School East on April 20th. T. 652. Petitioner's trial counsel then read back Gill's testimony from the summer of 1982, where Gill had testified that it "basically" was only Brensic who had spoken to him that evening. T. 655. Following the read back, Gill was asked if he would like to change what he had just testified to on direct examination. T. 656. Gill declined, stating that he "basically testified to the exact same thing here today." T. 656. He then testified that he had a specific recollection that Petitioner "acknowledged." T. 657. Exactly what supposedly was acknowledged was not made clear in this particular dialog.

After hearing from "them" that "they" had been at a baseball game at the high school on the night of the 20th, Gill and his partner checked to see if there had been a baseball game that evening at the high school. T. 647. Gill testified that there were no lights or facilities for a night game at the high

---

**22.** Where, as here, the statement previously has been held by the highest court in the state to be a "vehement denial," it is not clear at all that the jury properly could have discounted this testimony. *See People v. Brensic,* 70 N.Y.2d at 18, 517

N.Y.S.2d 120, 509 N.E.2d 1226 (1987). However, this question would more properly be directed towards the weight—not the sufficiency—of the evidence, an issue which is not before this Court.

school and that there had been no game that night. T. 648. However, Gill could not remember the name of the person he had spoken with in order to learn such information. T. 658.

From this testimony, it is difficult, if not impossible, to determine whether or not Petitioner actually made a statement that he had been at the high school watching a baseball game on the night of Pius' murder. It is clear, however, that Gill did not pose a question directly to Petitioner, that Brensic did most of the talking, and that Brensic answered the particular question regarding "their" whereabouts on the night of the 20th. T. 671. Petitioner's acknowledgment of his agreement with Brensic's answer, if it can be viewed as a denial at all, is extraordinarily weak.

Even if the jury understood Petitioner's admissions at the Fourth Precinct (of stealing and drinking with the others) as a retreat from the earlier "denial," such contradiction does not demonstrate Petitioner's guilt. *See* Resp. Mem., at 65. While false exculpatory statements may evidence consciousness of guilt, such evidence is weak. *United States v. Scheibel,* 870 F.2d 818, 822 (2d Cir.1989). Evidence of consciousness of guilt, however, may bolster other evidence that strongly points to the defendant's guilt. *Id.; see also People v. Seifert,* 152 A.D.2d 433, 443, 548 N.Y.S.2d 971, 977 (4th Dep't 1989). And, of course, false exculpatory statements are not themselves sufficient to establish guilt, nor are they admissible as evidence of guilt. *Scheibel,* 870 F.2d at 822.

In sum, the "acknowledgment" by Petitioner of Brensic's statement that "they" had been at the high school watching a baseball game on the night of April 20th hardly constitutes a denial. Thus, Petitioner's statements at the Fourth Precinct can hardly be said to have contradicted such an acknowledgment. Moreover, even if the jury believed that Petitioner had in fact retreated from his earlier "denial," the evidence of consciousness of guilt is weak, and is not enough to establish ultimate guilt. Even assuming the statements evidence Petitioner's consciousness of guilt, the statements do little to help the prosecution's case because the other evidence in this case does not "strongly point" to Petitioner's guilt. *See Seifert,* 152 A.D.2d at 443, 548 N.Y.S.2d at 977.

3. Statements at the St. James Railroad Station

As correctly stated by the Second Department in its direct review of Petitioner's conviction, the primary evidence linking the Petitioner to the murder of John Pius emerges from the testimony of James Burke, John McCort, Danny Culotta, Michael Burke and David O'Brien. *People v. Quartararo,* 612 N.Y.S.2d at 640. Indeed, "without these statements, there was no case against petitioner." *Fogg,* 679 F.Supp. at 245. This testimony pertained to the conversation which took place among all six at the St. James Railroad Station in July or August, 1979.

The testimony of the five witnesses is reproduced in the Factual Background section, *supra.* Under New York law, "incriminating statements made by a defendant, in order to be admissible, must be unambiguous in content ... [and] the circumstances in which the remarks were made must not detract from their reliability." *People v. Ryan,* 121 A.D.2d 34, 64, 509 N.Y.S.2d 545, 564 (2d Dep't 1986), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2202, 95 L.Ed.2d 857, *opinion recalled and vacated and judgment rev'd,* 134 A.D.2d 300, 520 N.Y.S.2d 528 (2d Dep't 1987) (citing *People v. Smith,* 104 A.D.2d 160, 164, 481 N.Y.S.2d 879 (2d Dep't 1984); *People v. Knatz,* 76 A.D.2d 889, 428 N.Y.S.2d 709 (2d Dep't 1980)). After a careful review of the circumstances in which these statements were made, the ambiguity of both the question asked and the answer given, and the inconsistencies between what the Petitioner reportedly said, the Court concludes that this evidence is insufficient to support a conviction of intentional murder.

First, the circumstances in which the statements were made detract from their reliability. Each of the witnesses testified that Petitioner had been drinking. T. 791, 850–51, 887–88, 902, 925. McCort, Culotta, Michael Burke, and O'Brien also were drinking. T. 850–51, 887–88, 902, 924. Although James

Burke testified that he had not been drinking, O'Brien testified that he believed that James Burke had been drinking. T. 925.[23] The fact that young boys were drinking could affect their recall of the words spoken, their memories of the events, and their perception of the conversation.

Second, the witnesses testified to different versions of the same event. Only James Burke recalled Petitioner stating "ask Brensic" in reply to an inquiry by Culotta regarding who killed John Pius. T. 780. Not even Culotta testified that he had asked who killed Pius; when asked directly if he remembered Petitioner saying "ask Brensic," Culotta said no. T. 892. Additionally, McCort and O'Brien both testified that Petitioner did not say who he was with the night of the murder, T. 844, 921, but Michael Burke testified that Petitioner had said that he was with Peter, Brensic, and Ryan. T. 845, 921, 901. Culotta and James Burke did not testify one way or the other about whether Petitioner had mentioned who he was with.

Moreover, Culotta testified that Petitioner said that Pius had seen him putting the minibike in the back of Ryan's car. T. 881. Michael Burke testified that Petitioner had said that he had seen Pius in the Dogwood area when they had possession of the minibike. T. 901.[24] James Burke and O'Brien testified that Petitioner had said that Pius had seen them stealing the minibike. T. 781, 920. McCort did not testify at all regarding whether Petitioner had stated that Pius (1) saw them with the bike, or (2) putting the bike in the back of the car, or (3) in possession of the minibike. These inconsistencies further detract from the reliability of the reports of Petitioner's statements.

Surprisingly, one of the areas where the testimony converged the most concerned Petitioner's denials of any involvement in the murder. James Burke testified that Petitioner stated that "he didn't touch the kid" and that all he did was put the bike against the tree. T. 781. McCort testified that Petitioner stated that he put Pius' bike against a tree while "those guys" beat him up, T. 845, and that in substance Petitioner stated that he had no involvement in doing anything else. T. 864. Culotta testified that Petitioner said "he didn't do anything," and that all he did was put the bike against the tree. T. 892–93. Michael Burke did not testify regarding any denial by Petitioner. O'Brien testified that Petitioner stated that "they" chased after Pius, caught up to him, stepped on him, beat him up, punched him and kicked him. T. 920.[25] O'Brien's testimony is unclear as to whether "they" included Petitioner or not; obviously, if Petitioner's words were that "they" had chased Pius, he could not have been referring to himself as a participant. O'Brien testified that Petitioner said that he had put the bike someplace. T. 920.

The area of most controversy is the reported statements of Petitioner in response to the question reportedly asked by Culotta. Both the question as reported by the five witnesses, and the Petitioner's response, are plagued with ambiguity.

For example, neither McCort nor O'Brien testified regarding what the question was. McCort could not remember what the question was. T. 845. O'Brien, whom the prosecutor argued to the jury was particularly trustworthy, T. 1173, did not testify at all about the answer given by Petitioner.

James Burke testified that Culotta had asked Petitioner, "How could you kill someone for just stealing a minibike?" T. 780. However, at the first trial, James Burke testified that Culotta had asked, "How could *someone* kill a kid for just stealing a mini-

---

**23.** At Petitioner's first trial, McCort and O'Brien both testified that all of the participants in the conversation had been drinking beer. *Fogg,* 679 F.Supp. at 227.

**24.** At Petitioner's first trial, Michael Burke "testified that he thought Petitioner said that he had seen Pius the night of the murder—'something like that'—but was 'not really sure.'" *Fogg,* 679 F.Supp. at 226. Moreover, "Michael Burke was uncertain of exactly what petitioner said that night, repeatedly emphasizing that he was not sure." *Id.*

**25.** Significantly, none of the other four witnesses corroborated O'Brien's testimony that Petitioner had stated that "they" had chased, beat, stepped on, and kicked Pius. *See also Fogg,* 679 F.Supp. at 227. Moreover, the Court has considered but rejects the argument that Petitioner meant to include himself as part of the "they" because "he" alone put the bike against the tree.

bike?" *Fogg*, 679 F.Supp. at 226 (emphasis added). Michael Burke testified that Culotta asked Petitioner, "How could you kill someone for just stealing a minibike?" T. 901. However, at the first trial, Michael Burke testified that Culotta asked Petitioner, "How *you could* kill somebody for just stealing a mini-bike?" *Fogg*, 679 F.Supp. at 226 (emphasis added).

The differences in the phrasing of the question are important. It is apparent that the question was reported by the Burke brothers in 1990 in a much more incriminating way than how the two reported it in Petitioner's first trial. The words "how could you" indicate a more direct question than the words "how could someone" or "how you could." As is obvious, one of the issues involved with this conversation is whether Petitioner was responding to a question directed to him individually, or not.

Respondent admits that inconsistencies in this testimony are not surprising given the eleven-year lapse of time between the murder and the Petitioner's second trial. Resp. Mem., at 74. It is clear as a matter of common sense that one's recollection of an event is much better one year after the event than it is eleven years after the event. But where the inconsistencies are not confined just to the five witnesses' recollections of the event, but also to the same witnesses' prior testimony, the inconsistencies become too great to overlook.

Most informative is Culotta's testimony regarding the question he asked Petitioner in 1979. On direct examination, Culotta testified that he asked Petitioner, "how he could kill a kid like that, shoving rocks down his throat." T. 881. On cross-examination, however, Culotta testified that he asked Petitioner, "How do you kill a kid like that by shoving rocks down his throat?" T. 889. Culotta testified that this second phrasing was "exact." T. 889. And at Petitioner's first trial, Culotta testified that he had asked, "How could you kill a kid like that?" *Fogg*, 679 F.Supp. at 227. Thus, the very person who asked the question has reported at least three different versions of the question. These inconsistencies add to the overall ambiguity of the conversation at the St. James Railroad Station.[26]

The Petitioner's reported response to Culotta's question was no less ambiguous. James Burke testified that Petitioner responded, "If you were drunk and stoned, and you didn't want to get caught, you would do the same thing." T. 780–81.[27] McCort testified that Petitioner said, "If you were drunk enough and didn't want to get caught, you'd do the same thing." T. 845.[28] Culotta testified that Petitioner said, "If you were drunk and stoned and he saw you stealing a mini-bike, you would do the same thing." T. 881.[29] Michael Burke testified that Petitioner responded, "If you were drunk and stoned and you didn't want to get caught, you would have probably done the same thing." T. 901.[30] David O'Brien did not testify at all regarding Petitioner's response.

Respondent, of course, argues that this response by Petitioner essentially was an admission of guilt, as if Petitioner had said instead, "I was drunk and stoned, and I didn't want to get caught." Such an interpretation, however, fails to consider the context of the conversation. There is no indication that the Petitioner understood Culotta's question, however it was phrased, to refer only to himself. Moreover, Petitioner's re-

26. The Appellate Division, in finding the evidence sufficient to support Petitioner's conviction, emphasized the phrasing of Culotta's question. *People v. Quartararo*, 612 N.Y.S.2d at 640.

27. At the first trial, James Burke testified that Petitioner's response had been, "If you were drunk and if you didn't want to get caught, you would do the same thing." *Fogg*, 679 F.Supp. at 226.

28. At Petitioner's first trial, McCort testified that Petitioner had responded, "If you were drunk, drunk enough, and you didn't want to get caught, you'd do the same thing." *Fogg*, 679 F.Supp. at 226.

29. At the first trial, Culotta testified that the response was, "If you were drunk and stoned, and he saw you stealing a mini-bike, you would do the same thing." *Fogg*, 679 F.Supp. at 227.

30. At the first trial, Michael Burke said the response had been, "If you were drunk, you would probably do the same thing." *Fogg*, 679 F.Supp. at 226.

sponse, phrased as it was in the second-person, did not facially incriminate him. Additionally, the fact that Petitioner had been drinking, and at least four out of the five witnesses had been drinking, further reduces the reliability of this statement. "Transposition of a word or words in the narration may give a meaning other than the real. A listener is liable to misunderstand or forget what was really said or intended by the declarant, or to incorrectly relate it." *Gangi v. Fradus*, 227 N.Y. 452, 458, 125 N.E. 677 (1920). Moreover, "[a]dmissions are easily fabricated or imagined." *Id.*

Finally, none of the participants in the conversation believed the statements to be significant enough to report to either the police or their parents.[31] T. 799, 853–54, 890, 907. In sum, the danger that these statements may not have been accurately reported is very high.[32] The Court finds that this testimony simply was too ambiguous and that the circumstances surrounding the testimony significantly detract from its reliability.

 Viewed in the light most favorable to the prosecution, the jury could have found from this testimony (1) that Petitioner was with the other three defendants that night; (2) that John Pius had seen them steal or in possession of a minibike; (3) that "they" chased after Pius and caught up to him; that "they" stepped on him, kicked him, beat him up, and punched him; and (4) that Petitioner took Pius's bike and put it someplace. T. 919–21. However, from these statements there is no permissible inference that Petitioner then, with the conscious objective to do so, solicited, requested, commanded, importuned, or intentionally aided the principal(s) in engaging in intentional murder.[33] Mere presence at the scene of the crime is not enough to convert Petitioner into an ac-

complice, even with knowledge of the others' wrongful conduct. *Reyes*, 82 A.D.2d at 926, 440 N.Y.S.2d at 675. Where, as here, culpability is premised on accomplice liability, the accomplice must share the intent of the principal actor and have taken some action that aided the principal. *Bennett*, 554 N.Y.S.2d at 672, 160 A.D.2d at 951; *LaBelle*, 18 N.Y.2d at 412, 276 N.Y.S.2d at 110, 222 N.E.2d 727. Here, Petitioner's statements at the railroad station do not rise to the level required to ground liability.

Certainly there is no evidence in this record that Petitioner himself put rocks down the victim's throat. There also is no evidence demonstrating that any of the other three defendants did so. The principal actor or actors are unidentified; thus is difficult to establish that the accomplice shared the intent of the unknown principal. The prosecution did not meet its burden with this particular testimony.

Respondent argues forcefully that "[t]he question is not the reliability of the statements, rather it is one of the reliability of the witnesses' recollections of the various statements." Resp. Mem., at 68–69. Respondent cites no case law in support of this assertion. Moreover, the record amply demonstrates not only that the reliability of these reported statements is questionable, but also that the reliability of the witnesses' recollection of the statements is debatable. One need only look at the small but significant differences between the witnesses' testimony in the first trial and that in the second trial, discussed *supra*, to see the problems apparent in the reporting of Petitioner's statements.

Respondent further urges the Court to apply the five-factor test outlined in *Chambers v. Mississippi*, 410 U.S. 284, 300, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) in order to

---

**31.** However, James Burke and McCort testified—eleven years later—to being "shocked" by Petitioner's statements. T. 796–97, 854. Michael Burke reported being "surprised" by the conversation. T. 905. On the other hand, Culotta did not feel that the statements constituted any sort of confession, and had no particular reaction to the conversation. T. 890–93.

**32.** There is also a plausible question whether the reporters of this conversation could have been confused between Petitioner's statements and

Brensic's statements. Testimony was elicited at Brensic's first trial that when asked if he killed Pius, he replied, "[i]f you were drunk you would have done it." *People v. Brensic*, 119 A.D.2d at 289, 506 N.Y.S.2d 570.

**33.** *Cf. Sanchez*, 61 N.Y.2d at 1023, 475 N.Y.S.2d at 377, 463 N.E.2d 1228 ("Respondent's statements may have proved his presence at the scene of the crime close in time to its commission, but the fact of his presence did not establish that he was the strangler.")

evaluate the internal reliability of Petitioner's reported statements. Resp. Mem., at 70–71. These factors are (1) whether the statements were made spontaneously and to a close acquaintance; (2) whether the statements were made shortly after the crime was committed; (3) whether the statements were corroborated by some other evidence; (4) whether the sheer number of statements provide additional corroboration; and (5) whether the statements were clearly self-incriminatory and unquestionably against self-interest. *Id.* at 300–01, 93 S.Ct. 1038. Respondent argues that these factors weight in favor of a finding that Petitioner's statements were reliable.

The Court disagrees. First, while the statements were made to Petitioner's friends, they hardly were spontaneous because they were neither unprompted, nor impulsive or instinctive. Moreover, the statements analyzed in *Chambers* clearly were confessions, and were so labeled by the Supreme Court. *Id.* at 287, 300, 93 S.Ct. 1038. The statements here are not confessions. Second, the statements here were made at least three months after the murder, and perhaps longer—certainly long enough to allow Petitioner ample time to deliberate about his being investigated for murder. Third, the statements have not been corroborated by additional evidence. In *Chambers,* the statements were corroborated by evidence such as the testimony of an eyewitness to the crime, proof that the declarant previously had owned a .22–caliber weapon, and proof that the victim had been struck with four .22–caliber bullets. *Id.* at 286, 300, 93 S.Ct. 1038. There is nothing similar here—nothing at all to indicate Petitioner's presence at the scene, nor that he participated in the assault on Pius—other than these statements. Fourth, the number of statements here which may provide additional corroboration is zero. Again, no other statements place Petitioner at the Dogwood Elementary School on April 20, 1979, and no other statements implicate him in the assault. In *Chambers,* the declarant had confessed to the crime on at least four separate occasions. *Id.* at 289, 93 S.Ct. 1038.

Finally, these statements, as previously discussed, are not "clearly" self-incriminatory

and are not "unquestionably" against his interest. There is no valid comparison at all between the declarant's confessions in *Chambers* and Petitioner's statements here. In sum, Petitioner's statements at the St. James Railroad Station do not support an inference that meets the legal standard for accomplice liability on a charge of intentional murder. *Chambers* offers no support for the contrary conclusion.

4. Statements at the St. James Elementary School

The next set of statements took place a few weeks later, in September, 1979 at the St. James Elementary School. These statements also are ambiguous. McCort, Culotta, and James Burke were present at this conversation.

James Burke testified that "[t]he conversation, what I remember of the conversation, is Michael said that the Homicide detectives had shown him photos of Pius. And that his face, his nose was smashed off and that he was covered with leaves. In addition, Mike had said that—I asked him, I said, 'Well, are you in anymore trouble with this Pius case?' And he said, 'The pigs fucked it up and too much time had passed.'" T. 782.

John McCort recalled that Petitioner was asked "[s]omething pertaining to, 'What's happening to you?,' as far as, 'What's going on with you?'" T. 846. McCort testified that Petitioner responded: "He said that the cops had fucked up and that he probably would get off." T. 846.

Dan Culotta testified in a similar vein. Culotta stated that "[s]omebody asked Michael, 'Are you still in trouble with the police?' And he said, 'No. It's too late. The cops fucked it up. The pigs fucked it up. They'll never catch us.'" T. 881–82.

These statements, like those made by Petitioner at the St. James Railroad Station, do not constitute evidence constitutionally sufficient to support Petitioner's conviction of intentional murder. First, there was no testimony that the police had shown photos of the murder scene to Petitioner. Second, the statements, more than anything, indicate Petitioner's opinion at the time that he was no

longer in trouble with the police. He was not asked if he was in trouble with regard to the "Pius murder." Rather, he was asked if he was in trouble with the police or with the Pius case. The "Pius case" could have referred to a number of other incidents, including the theft of the minibike, the driving around and drinking with the others, his knowledge that Peter had confessed, the rampant rumors in the community, et cetera. The context of these statements provides too many possibilities to permit the jury to infer that it was the murder on Petitioner's mind when he opined that he was no longer in trouble.

Even if the jury inferred from this ambiguous statement that Petitioner was referring to the murder, the statement that "they'll never catch us" or "that he would probably get off" still does not establish the required elements of the crime under New York law. *See Einaugler,* 109 F.3d at 839. At most, such statements would constitute only evidence of consciousness of guilt. The statement that "the pigs fucked up" has no evidentiary significance at all.

Finally, virtually the same words that were credited to Petitioner at the St. James Elementary School were also attributed to Brensic. "In late September 1979, [Brensic] was in the company of several friends on the grounds of the St. James Elementary School when he was asked if was still being investigated in connection with the Pius case. [Brensic] responded that '[t]he pigs fucked it up and that they'd never get him.' " *People v. Brensic,* 119 A.D.2d at 289, 506 N.Y.S.2d 570. The striking similarity tends to diminish the reliability of the statement reportedly made by Petitioner—in the same month and year and in the exact same location where Brensic's statements were made. *See Fogg,* 679 F.Supp. at 250–51.

#### 5. Other Arguments

Petitioner argues that the fact that the prosecution put on fewer witnesses at the second trial than at the first trial weighs in favor of a finding of insufficiency. Pet. Mem., at 54, n. 27. In particular, Petitioner points out that Judge Korman had labeled the evidence in the first trial "exceedingly weak," and argues that the presentation of less testimony in the second trial "crossed the line from 'exceedingly weak' to insufficient." *Id.; see also Fogg,* 679 F.Supp. at 249. Respondent replies that the evidence presented at the retrial was not weaker than that at the first trial, and points out that the evidence at the first trial was deemed sufficient by Judge Korman. Resp. Supp., at 15; *see also Fogg,* 679 F.Supp. at 214, n. 3.

While it is clear that Judge Korman's prior decision regarding the first trial is not binding on this Court's decision regarding the second trial, it nevertheless provides helpful information which cannot be disregarded. This is particularly true with regard to the variations in the testimony of the witnesses, discussed *supra.* Additionally, as Petitioner correctly points out, the prior writ was granted on Petitioner's ineffective assistance of counsel claim. *Fogg,* 679 F.Supp. at 251. Because this claim was so strong, the insufficiency claim was not analyzed. *Id.* at 214. Thus, to the extent that Respondent argues that Judge Korman decided that the evidence in the first trial was sufficient, any such remarks were dicta. Judge Korman made it clear that a thorough analysis of the evidence was required only to fully evaluate the ineffective assistance claim. *Id.* It is that analysis which is helpful to the Court in the present examination.

Petitioner points out that the evidence in the second trial was more insufficient than that in his first trial because several witness were not called by the prosecution at the retrial. Pet. Mem., at 54, n. 27. For example, at the second trial Culotta did not testify about a conversation between Peter Quartararo and Thomas Ryan in Peter's bedroom. *Fogg,* 679 F.Supp. at 227. Gwen Fox, Petitioner's girlfriend in 1979, did not testify at the retrial about her conversation with Petitioner about the Pius murder. *Id.* at 227–28. Michael O'Neil did not testify at the retrial about his having overheard a conversation between Peter and Brensic regarding the Pius murder. *Id.* at 219. Finally, Peter Quartararo did not testify at the retrial. *Id.* at 228–30.

Respondent contends that the testimony of these witnesses was not necessary at the

retrial because it would have been either cumulative or repetitive, or was presented through other witnesses, or was of questionable value. Resp. Supp., at 15. Respondent argues first that Peter Quartararo's testimony at the first trial "did *not* support petitioner's culpability in the Pius murder." *Id.* (emphasis in original). However, this argument ignores the deposition testimony of the trial judge who presided at the first trial, who characterized Peter's confession as "powerful, powerful evidence" against Petitioner. *Fogg,* 679 F.Supp. at 230.

Regarding O'Neil's testimony, Respondent argues that such testimony did not implicate Petitioner in the murder. Resp. Supp., at 15–16. This assessment is accurate. However, Petitioner was found guilty as an accomplice in Pius' murder. There was no evidence presented in the second trial that *any* of the four defendants murdered Pius. Thus, O'Neil's testimony that he overheard Brensic and Peter joking about putting rocks down Pius' throat could have provided the crucial link between Petitioner's alleged role as an accomplice and the role of the principal actor or actors. *See Fogg,* 679 F.Supp. at 219. Respondent's argument that O'Neil's testimony would have been useless is without merit.

The same can be said for the prior testimony of Culotta regarding a conversation he overheard between Peter and Ryan in Peter's bedroom. Culotta testified at the first trial that he heard Peter say to Ryan, "I think we got away with it." *Fogg,* 679 F.Supp. at 227. Ryan allegedly responded, "I think so, too." *Id.* Culotta testified that Petitioner then had told Culotta, "They're talking about the murder in there.... I had nothing to do with it." *Id.* Again, such testimony could have provided the connection between Petitioner's actions and that of his co-defendants.

Regarding the testimony of Gwen Fox, Respondent argues that while she had testified in the first trial for the prosecution, she later recanted and became a defense witness. Resp. Supp., at 16. In doing so, according to Respondent, she undermined her credibility. *Id.* However, credibility is a question for the jury, which permissibly may have credited or discounted all or part of her testimony and recantation. Fox's testimony, later recanted, was that she had asked Petitioner if he had killed Pius, and that he responded affirmatively. *Fogg,* 679 F.Supp. at 227. When Fox told him that she did not believe him, Petitioner allegedly said, "I don't care if you don't believe me. I did it." *Id.* Regardless of her subsequent recantation, this testimony provided evidence of Petitioner's involvement in the murder, which a jury either could have believed or not. Nevertheless, because it was not presented in the second trial, this Court cannot consider it when evaluating the sufficiency claim.

Thus, the Court finds that there are significant differences between the evidence presented at the first trial and that presented at the second trial. Another judge of this Court characterized the evidence at the first trial as "exceedingly weak." *Fogg,* 679 F.Supp. at 249. This Court now concludes that the evidence presented at the second trial not only was overwhelmingly weak, but insufficient as a matter of law.

The evidence in this case only becomes sufficient if it is assumed from the beginning that Petitioner and the others, acting in concert, committed the murder. If that fact is assumed, then Petitioner's statements at the railroad station and at the elementary school make some sort of sense. However, the fact of the murder, more particularly Petitioner's role therein, is the ultimate fact to be determined.[34] The evidence presented at this trial is insufficient to support the conclusion that any of the four defendants, Petitioner in par-

---

34. "[A] conviction based entirely upon circumstantial evidence 'is subject to strict judicial scrutiny ... to ensure that the jury has not relied upon equivocal evidence to draw unwarranted inferences or to make unsupported assumptions.'" *Seifert,* 152 A.D.2d at 440, 548 N.Y.S.2d at 975 (quoting *People v. Way,* 59 N.Y.2d 361, 365, 465 N.Y.S.2d 853, 452 N.E.2d 1181 (1983)).

The reason for such scrutiny "is to foreclose 'a danger legitimately associated with circumstantial evidence—that the trier of facts may leap logical gaps in the proof offered and draw unwarranted conclusions based on probabilities of low degree.'" *Id.* (quoting *People v. Benzinger,* 36 N.Y.2d 29, 32, 364 N.Y.S.2d 855, 324 N.E.2d 334 (1974)).

ticular, played any role in causing Pius' death.

■ Most troubling is the absence of any evidence tending to demonstrate that Petitioner had the requisite state of mind required to sustain a conviction for intentional murder. Intent to cause death may not be inferred from the mere fact that the victim was killed. *People v. Marrero,* 67 A.D.2d 951, 413 N.Y.S.2d 406, 407 (2d Dep't 1979). As noted in *Fogg,* "[w]hile the manner in which Pius died supports the inference that those who [killed him] did so with the requisite state of mind, it does not necessarily follow that each of the participants—in particular, petitioner—did so." *Fogg,* 679 F.Supp. at 250, n. 38. The Court finds that there are no permissible inferences that any rational jury could have made that would have established the intent required by New York law to sustain a conviction for intentional murder. Moreover, as a matter of federal constitutional law, the inferences are not sufficiently supported to permit a rational juror to find that Petitioner's intent was established beyond a reasonable doubt. *See Martinez,* 54 F.3d at 1043.

Judge Korman, based on much more evidence—and much more incriminating evidence—than that now before the Court, called the question of Petitioner's state of mind "extremely close." This Court now holds that the evidence presented in Petitioner's retrial was insufficient as a matter of law to prove that Petitioner had the state of mind necessary to sustain his conviction for intentional murder.

In an effort to demonstrate that the evidence supporting Petitioner's conviction was sufficient as a matter of federal constitutional law, Respondent string-cites to fourteen cases dealing with sufficiency issues. Resp. Mem., at 72–74. However, the cases do little to inform the Court's analysis. If anything, the cases support Petitioner's arguments, not Respondent's. For example, in *Smithwick v. Walker,* 758 F.Supp. 178 (S.D.N.Y.1991), the defendant's habeas claim based on insufficiency of the evidence was denied where he had admitted to a close friend that he and an accomplice had opened the elevator door and fired, and the victim was found dead of gun-

shot wounds in the elevator. *Id.* at 184. Obviously there is no such similar situation here. Respondent next cites *People v. Loliscio,* 187 A.D.2d 172, 593 N.Y.S.2d 991 (2d Dep't 1993), where the defendant's murder conviction was upheld based in part on hair and fiber evidence recovered from the defendant's car. There was no physical evidence here, and what was recovered was exculpatory.

Respondent also cites *People v. Lewis,* 64 N.Y.2d 1111, 490 N.Y.S.2d 166, 479 N.E.2d 802 (1985), where defendant's conviction of second-degree murder was upheld against an insufficiency challenge. In *Lewis,* the defendant had been the last person seen with the victim, he fled the jurisdiction immediately after the murder, lied to the police, and altered his appearance. *Id.* at 1113–14, 490 N.Y.S.2d 166, 479 N.E.2d 802. Here, of course, none of the defendants were ever seen with Pius on the night of the murder, and none of them fled the jurisdiction. In *People v. Leon,* 152 A.D.2d 639, 543 N.Y.S.2d 523 (2d Dep't 1989), the defendant's conviction was upheld where there was physical evidence linking him to the murder, and the defendant had implicated himself when speaking to a fellow prison inmate. *Id.* at 640, 543 N.Y.S.2d 523. Again, there is no physical evidence here which links Petitioner to the Pius murder. Respondent also cites *People v. McCullough,* 141 A.D.2d 856, 530 N.Y.S.2d 198 (2d Dep't 1988), where defendant's second-degree murder conviction was affirmed. McCullough, however, had been seen by two witnesses forcing the victim down the street to his car, requested an alibi from his cousin, lied to the police, and admitted to having beaten the victim the night before she was killed. *Id.,* at 857, 530 N.Y.S.2d 198. There are, of course, few similarities to Petitioner's case.

Respondent further cites to *People v. Gordon,* 111 A.D.2d 409, 489 N.Y.S.2d 608 (2d Dep't 1985), where the evidence supporting defendant's murder conviction was found sufficient as a matter of state law. Unlike the present Petitioner, however, Gordon had been seen with the victim shortly before the victim's body was found on the terrace of the building. *Id.* Gordon also gave police a false

alibi, and admitted to newspaper reporters that he did not know what he was doing, that he was intoxicated, and that he was sorry about the whole thing. *Id.* While there are more similarities to the present case in *Gordon* than those thus far cited, the factual differences still are too great to analogize between the two.

None of the other cases sustaining convictions where the sufficiency of the evidence was challenged merit further analysis, because they all differ factually from the circumstances presented here. *See People v. Villalona*, 162 A.D.2d 565, 556 N.Y.S.2d 752 (2d Dep't 1990) (affirming conviction where eyewitness heard defendant make a threat and then shoot the victim); *People v. Levine*, 65 N.Y.2d 845, 493 N.Y.S.2d 290, 482 N.E.2d 1206 (1985) (affirming conviction where defendant lied to police and where victim's wallet was found in defendant's bedroom); *People v. Sunset Bay*, 67 N.Y.2d 787, 501 N.Y.S.2d 19, 492 N.E.2d 127 (1986) (affirming conviction where hair and footprints found at crime scene matched defendant and victim's blood found outside defendant's doorway); *People v. De Oliveira*, 116 A.D.2d 770, 496 N.Y.S.2d 834 (3d Dep't 1986) (affirming conviction where defendant was seen bicycling away from place where victim's body later was found and where defendant made statements indicating knowledge of victim's death prior to discovery of the body).

Viewing all of this in the light most favorable to the prosecution, and drawing all inferences in the prosecution's favor, the evidence is insufficient to support Petitioner's conviction. No rational juror could have found the elements of intentional murder beyond a reasonable doubt. Thus, the Court finds that Petitioner's due process rights were violated by his conviction for intentional murder under N.Y. Penal L. § 125.25(1). For these reasons, the writ must be GRANTED as to this claim.

## III. VENUE AND THE IMPARTIALITY OF THE JURY

█ Finally, Petitioner claims that he was deprived of his constitutional right to a fair trial and impartial jury (1) by the prejudicial pretrial publicity and (2) by the actual prejudice of jury member John Friedel, whom the trial court refused to excuse for cause. In assessing this claim, the Court agrees that "the Pius case," as this case has become known, received a large amount of publicity at the time of the murder in 1979 and remained a topic of reporting in the intervening eleven years between the murder and Petitioner's second trial. This publicity was due in part to the fact that the four co-defendants have been prosecuted to trial seven times after several reversals on appeal and, of course, the grant of two writs of habeas corpus. Nevertheless, the Court has reviewed this claim and finds that the media accounts of the retrial and other events surrounding this case did not create a presumption of prejudice among the jurors, and that there was no constitutional error committed by the seating of juror John Friedel.

Pertinent to this inquiry, jury selection began on February 7, 1990 and concluded on February 27, 1990. To assure that a fair jury was selected, the trial court established a screening procedure by which any juror who indicated prior knowledge of the case was individually questioned outside the presence of the other jurors. The court began the procedure by questioning several groups of jurors. Each group that was called was addressed as a group to ascertain which of these potential jurors had *not* heard of the Pius case after a brief description from the judge. Those few jurors who had no knowledge of the case were then instructed to return for jury selection the following week. The remaining jurors were then questioned solely as to whether they had time, health or employment conflicts. Those potential jurors with conflicts were then excused. The remainder of the panel was then individually questioned in the judge's chambers as to the extent of their knowledge of the case. This "prescreening" procedure lasted from February 7 to February 16 and amounts to over 1600 pages of transcript.[35]

Through this screening process, it is agreed that 95%, or 282 of 297, of the poten-

---

**35.** Because some of the dates are individually paginated, references to the transcript will be denoted by the date, followed by "V.D." for voir dire, followed by the page number.

tial jurors indicated that they had heard of the case. The fifteen jurors with no knowledge of the case were asked to return for jury selection. Following this initial round, 114 of the 282 remaining jurors were excused for non-publicity considerations, such as health, employment or time commitment issues. Of the remaining 168 jurors, the court *sua sponte* dismissed an additional seventy-eight jurors based on their knowledge of the case from the pretrial publicity. Another eight jurors were dismissed based on defense objections, and one was dismissed on objection from the prosecution. The court denied twenty-six other challenges for cause from the defense.[36] At the close of challenges for cause, eighty-one potential jurors remained.

At the time of jury selection, the judge himself indicated that the case "did and does enjoy quite a bit of publicity." 2/7 V.D. 2. Judge Mallon also stated that "when any or anything happened about the case, it was always reported." 2/14 V.D. 5. Indeed, Petitioner has indicated that between February 10, 1988 (the day after his first habeas petition was granted) and February 21, 1990 (the conclusion of voir dire), more than fifty articles concerning the Pius case were published in *Newsday,* including articles on Brensic's retrial and guilty plea, the grant of Peter Quartararo's habeas petition on the ground that his confession was involuntary and the dismissal of the indictment against him, the retrial and mistrial of Thomas Ryan, and the response of the Pius family. The Court has reviewed these articles, which are provided in Petitioner's appendix.

### A. Presumptive Prejudice of the Jury

Petitioner's claim with respect to the fairness of his trial is that the jury was *presumptively* prejudiced against him on the basis of pretrial publicity surrounding the Pius murder. Because of this presumptive prejudice, he claims that it was improper to deny his motion for a change of venue.

In *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Supreme Court set forth the general rule that a crimi-

nal defendant is not deprived of a fair trial simply because members of the jury have heard about the case or have knowledge of some of its basic facts. The starting point for this Court's analysis, therefore, is *Irvin*'s underlying rule that "[i]t is not required ... that the jurors be totally ignorant of the facts and issues involved." *Id.* at 722, 81 S.Ct. 1639. More importantly, the Court stated:

> To hold that the mere existence of any preconceived notion as to the guilty or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.* at 723, 81 S.Ct. 1639.

The Supreme Court also recognized, however, that in certain cases a pattern of deep and bitter prejudice against the criminal defendant, as evidenced by overwhelming and highly prejudicial pretrial publicity and preconceptions of the defendant's guilt, can create a presumption of prejudice among the jurors. *See id.* at 727, 81 S.Ct. 1639. Indeed, in *Irvin,* eight out of the ten empaneled jurors admitted that they felt the defendant was guilty prior to the start of the trial, despite the fact that the defendant faced the death penalty. The Court also noted that during the six or seven months prior to the defendant's trial, "a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against [the defendant]." *Id.* at 725, 81 S.Ct. 1639. In certain cases, therefore, adverse pretrial publicity can create a presumption of prejudice in the community such that the jurors' claims during voir dire that they can be impartial should not be believed. *See Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). A trial court's determination that the jury as a whole is impartial may be overturned only on a finding of "manifest error." *Irvin,* 366 U.S. at 723, 81 S.Ct. 1639.

---

**36.** A number of the defense objections were made solely on the fact that the potential juror was either a subscriber or regular reader of *Newsday,* in which the bulk of the news accounts were published.

Where, as here, a defendant faces a retrial a significant time after the crime has occurred, the presumption of prejudice is more difficult to ascertain. The Supreme Court made this point clear in *Patton*, where the jury selection for the defendant's second trial did not occur until four years after his first trial, "at a time when prejudicial publicity was greatly diminished and community sentiment had softened." *Id.* at 1032, 104 S.Ct. 2885. In that case, the media accounts in the local newspapers leading up the second trial dealt mostly with brief announcements of the trial dates and scheduling, and the transcript of the voir dire indicated sparse publicity and minimal public interest prior to the second trial. *Id.* The Court even indicated that during the voir dire, the newspapers published articles on an almost daily basis, but these articles were purely factual articles generally discussing the jury selection process. *Id.* In these circumstances, the Supreme Court held that the trial court did not commit manifest error in finding that the jury as a whole was impartial. In particular, the Court noted that these articles failed to indicate a "wave of public passion" or a "barrage of inflammatory publicity immediately prior to trial" as required under *Irvin*. *See id.* at 1033, 104 S.Ct. 2885. Even the fact that some of jurors held strong convictions at some time did not require a finding of presumed prejudice because many of the jurors in the venire had their opinions weakened with the passage of time since the initial trial. *Id.*

■ When facing a retrial and the passage of time, therefore, the inquiry is not whether the great majority of the venire persons "remembered the case." *Id.* at 1035, 104 S.Ct. 2885. As stated in *Patton*, this conclusion, without more, "is essentially irrelevant." *Id.* As such, Petitioner's fixation on the fact that 95% of the venire had heard of the case is not indicative of a presumption of prejudice. Rather, the inquiry must be whether the jurors at the second trial "had such fixed opinions that they could not judge impartially the guilt of the defendant." *Id.* at 1035, 104 S.Ct. 2885. In making this determination, the Court specifically found that the passage of time "can be a highly relevant fact." *Id.*

As an initial matter, in support of his argument that prejudice should be presumed, Petitioner points to the fact that Robert Brensic's request for a change of venue was granted for his retrial in 1988. In that case, the Suffolk County District Attorney's Office agreed to the change, and it "unequivocally and candidly stated that based upon the results of the jury selection process as well as the documentation submitted by the defense, a change of venue is necessary to protect the defendant's right to a fair trial." *People v. Brensic*, 136 A.D.2d at 175, 526 N.Y.S.2d at 972. In granting the motion, however, the Appellate Division noted that many of the articles published just prior to jury selection expressly referred to the contents of Peter Quartararo's confession implicating Brensic. Indeed, during jury selection itself, an extensive article appeared in *Newsday* providing a history of the case, the impact on the family and front page photos of the crime scene. *Id.* at 971.

■ The Court does not find that the fact that Robert Brensic was granted a change of venue, standing alone, bears on whether it should have been granted two years later for the retrial of Michael Quartararo. Other than the obvious fact that two additional years had passed, the number of articles had greatly subsided and no longer tended to focus on Peter's confession and the previous trial deficiencies noted in this Court's prior decisions granting habeas corpus relief. Moreover, a review of the 3000 transcript pages of the screening process and voir dire in this case establishes that most jurors, although they had heard of the case, recalled very basic details involving how the murder was committed and the alleged motive; most could not recall anything further and only a few remembered there was a confession. Most jurors who had read about the case either had only read about it initially in 1979 or had not read about it in over a year prior to jury selection. Indeed, the few potential jurors that did recall a confession were not in the presence of other jurors when these facts were recounted, and they were *sua sponte* excused by the judge. Finally, although Petitioner makes much of the fact that some of the jurors had read about the case immedi-

ately prior to jury selection, and even during the process, each of these articles involved basic facts about the retrial and none of them referred to the confession. Accordingly, the Court finds that the decision to grant a change of venue in the Brensic retrial is not dispositive of Petitioner's claim.

Petitioner further argues that because the question of presumptive prejudice derived from pretrial publicity is a mixed question of law and fact, the trial court's decision is not entitled to a statutory presumption of correctness on habeas review. Pet. Mem., at 46. *See Coleman v. Kemp,* 778 F.2d 1487, 1537, n. 17 (11th Cir.1985). Petitioner attempts to distinguish the standard of review for claims of actual prejudice, discussed below, and presumptive prejudice, discussed here. Thus, Petitioner argues that the trial court's and the Appellate Division's factual findings regarding the extent and nature of pretrial publicity is not entitled to a presumption of correctness because they are not fairly supported in the record.

■■■ However, the *Patton* Court noted that although *Irvin* had stated that juror partiality was a mixed question of law and facts, it also held that the Ninth Circuit, when considering Patton's case, was incorrect when it determined that there is no presumption of correctness for the trial court's determination of presumptive prejudice affecting jury partiality. *See Patton,* 467 U.S. at 1031, 104 S.Ct. 2885. The Court explicitly stated that "the trial court did not commit manifest error in finding that the jury as a whole was impartial." *See id.* at 1032, 104 S.Ct. 2885. Thus, the manifest error standard applies to the question of presumptive prejudice, and the trial court's decision, therefore, is entitled to a statutory presumption of correctness. *Knapp v. Leonardo,* 46 F.3d 170, 176 (2d Cir.1995).

In further support of his claim, Petitioner cites to *Rideau v. Louisiana,* 373 U.S. 723, 724, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), where a film of the defendant confessing to the crime charged was broadcast in the county where the defendant was charged. The court, on habeas review, held that denying a motion for change of venue under these circumstances was a denial of due process. *Ri-*

*deau,* 373 U.S. at 726, 83 S.Ct. 1417. Certainly, there was much publicity surrounding the Pius case. However, the Court finds that the publicity here is not as incriminating as in *Rideau,* where the police department essentially told the potential jurors that the defendant had committed the crime by airing his confession on television in the county where he would be tried. *See id.*

The closest similarity between this case and *Rideau* is the reporting of Peter Quartararo's illegal confession and Robert Brensic's plea bargain, both of which tended to implicate the Petitioner. However, they can be distinguished from the situation in *Rideau.* First, Peter Quartararo's confession was found to be illegally obtained by the police, and he was not retried. A newspaper reader easily could interpret the inadmissibility of the confession as meaning that Petitioner and his co-defendants did not commit the murder, and instead that Peter had been bullied into a confession. Second, although Brensic implicated the Petitioner, the heading of the story illustrated to the reader Brensic's interests in pleading guilty. The headline included the wording, "Robert Brensic's surprise guilty plea paves his way to freedom .…" Pet. Supp. Appendix, at 36. This statement easily could lead a reader to give little weight to the plea because of Brensic's very apparent self interest. The Court determines that the newspaper reports of these two developments did not rise to the level of pretrial publicity that so prejudiced the defendant in *Rideau.*

Petitioner further argues that the passage of time only exacerbated the prejudice from publicity because the most inflammatory and prejudicial news reports occurred after 1988. First, in May 1988, Robert Brensic not only admitted his guilt, but also implicated the Petitioner. This guilty plea and admission triggered new publicity surrounding the reaction of the Piuses and the District Attorney's Office. Second, between 1988 and 1990, new trials were granted for the three other defendants. Thomas Ryan's second trial resulted in a mistrial. These developments also increased media coverage of the case that Petitioner claims "reminded readers that Peter Quartararo had confessed to

the crime and that all of the defendants had earlier been found guilty by a Suffolk County jury." Pet. Mem., at 42. Third, the Pius family was actively covered in the local papers because of their justifiable and understandable bitterness and vindictiveness against the defendants. Fourth, the news accounts between 1988 and 1990 were highly prejudicial because they focused on inadmissible facts, such as Peter's confession. The Court finds, however, that the publication of these stories did not result in a jury that was presumptively prejudiced against the Petitioner.

Petitioner also suggests that the statistics themselves bear out the prejudice, requiring a finding of presumed prejudice and a denial of due process. First, 95% of the initial pool has some knowledge of the case. Second, eighty-six out of 168 jurors, or 50%, had a disqualifying prejudice arising from pretrial publicity. These statistics, Petitioner argues, are enough to indicate a denial of due process. *See People v. Boudin,* 97 A.D.2d 84, 469 N.Y.S.2d 89, 91 (2d Dep't 1983) (change of venue granted where 55% of pool had preconceived opinions); *People v. Sawyer,* 94 A.D.2d 978, 464 N.Y.S.2d 104 (4th Dep't 1983) (change of venue granted when "almost half" of potential jurors had formed an opinion about the case). Even the eighty-six jurors who were excused for cause on the grounds of pretrial publicity did not all express a disqualifying opinion. Rather, a number of them felt uncomfortable with the topic as parents, others did not express any opinion whatsoever, but merely possessed a more detailed recollection of the facts than the trial judge felt was appropriate, while still others were excused for cause because they had personal relationships with either members of the victim's or defendants' families. Accordingly, the Court finds that the numbers alone are insufficient for the Court to find a presumed prejudice among the jurors.

More specifically, Petitioner focuses on the prejudice of the following prospective jurors as indicative of the presumptive prejudice in the community: Jeffrey Weighers (2/14 V.D. 23), Anthony Barregt (2/9 V.D. 737), Ciro Campos (2/14 V.D. 37), "another juror" (2/8 V.D. 245), Paul Geiss (2/8 V.D. 427–428), "another juror" (2/15 V.D. 180), Miriam Dougenis (2/9 V.D. 581–582), Bernard McManus (2/16 V.D. 203), Paul Smith (2/16 V.D. 103), Joseph Panzenski (2/14 V.D. 221), Joel Klein (2/14 V.D. 216), Sarah Gardner (2/8 V.D. 377), Barbara Aitken (2/14 V.D. 50), "another juror" (2/14 V.D. 590), Joseph Vitale (2/13 V.D. 166), Herman Stark (2/7 V.D. 125), "another juror" (2/14 V.D. 150), "another juror" (2/7 V.D. 54); *see also* 2/9 V.D. 470, 2/9 V.D. 661, 2/9 V.D. 735–36. Pet. Mem., at 33–35. Although these prospective jurors expressed strong feelings about this case, the Court finds that this fact does not require a finding of presumptive prejudice.

Petitioner further argues that because the court denied twenty-six defense challenges for cause, the defense was forced to exhaust its peremptory challenges against a number of potential jurors with more than just a passing familiarity with case. Among those, the defense peremptorily struck Stanley Yankowski (2/14 V.D. 108) and Anthony Oldham (2/16 V.D. 132–148), both of whom arguably had extensive knowledge of the case.

Additionally, although Petitioner exercised all of his peremptory challenges, ten of the twelve seated jurors still had some knowledge of the case. In particular, William Soehl (challenged for cause) had read about the case a few days before jury selection, (2/14 V.D. 172), knew that this was a retrial, (173), knew the prosecution's theory of the case, (179), and had heard people at work express negative opinions (182). Robert Curley (challenged for cause) was a regular *Newsday* reader and was familiar with the Quartararo name and believed that three or four perpetrators were involved. (2/15 V.D. 148–49).

Petitioner misunderstands, however, the nature of the inquiry. The Supreme Court repeatedly had made clear in *Irvin* and *Patton* that the inquiry is how many of the jurors had formed opinions of guilt—not whether they had basic knowledge of the facts. *See Mu'Min v. Virginia,* 500 U.S. 415, 428, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). In *Mu'Min,* the Court found no prejudice where eight out of twelve jurors had read or heard something about the case, but none

had indicated that they formed an opinion as to guilt, or that the information would affect their ability to judge the defendant solely on the basis of the evidence presented at trial. *Id.* at 417, 111 S.Ct. 1899.

Notwithstanding the statistical evidence, Petitioner also asserts that the specific recent events regarding Brensic's guilty plea and the grant of two writs of habeas corpus biased the jurors and that the responses of the potential jurors were indicative of the existence of a pattern of deep-rooted prejudice in Suffolk County. *See* Pet. Mem., at 44. *See also Knapp,* 46 F.3d at 176–77 (finding no prejudice where 83% of jurors were claimed to have prejudged defendant's guilt).

The Court disagrees once more. Although there were some jurors who expressed strong beliefs that the defendants were guilty and that justice had been served, most jurors had only vague or general recollections of the case. As noted above, a number of others simply felt that the facts of the case made it impossible for them to be fair because a child had been murdered and they feared for their own children. There was little evidence of bias specifically directed against Petitioner from any of the potential jurors. Therefore, the Court finds that Petitioner's claim of presumptive prejudice must fail.

## B. Actual Prejudice of the Jury

Petitioner also raises a claim of actual juror bias regarding juror John Friedel, who was seated over defense objections. Pet. Mem., at 37–38. Friedel stated that he had read about the case a few days prior to jury selection, knew that Petitioner previously had been convicted, and that the instant proceeding was a retrial. (2/13 V.D. 92, 93). He also believed that Petitioner was being retried because "there was some evidence that they're—that was used that shouldn't be used in court. They feel that it's—they got it illegally or whatever it is." (93). Friedel also believed that justice had been done after the first conviction. (93). Friedel also indicated that his co-workers had expressed very hostile opinions about Michael (102–03, 108). He also said that he could understand their feelings. (108). When asked by defense

counsel if he could disregard his knowledge, Friedel responded "I can't guarantee anything. But I would try to be as much objective as I could. That's all I can answer to that question." (110).

The trial court conceded that the decision with respect to Friedel was a "tough call." Nevertheless, Judge Mallon denied the challenge for cause because Friedel had assured the parties that "he'll give you a fair shake. And that he will be fair and impartial." (116).

The question of actual prejudice is one of historical fact. *Patton,* 467 U.S. at 1036, 104 S.Ct. 2885. As such, on habeas review, "the state court is entitled to a presumption of correctness with respect to its conclusion that the jury was impartial." *Knapp,* 46 F.3d at 176. To overturn a state court finding of jury impartiality, it is important to bear in mind that "wide discretion [is] granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror basis." *Mu'Min,* 500 U.S. at 427, 111 S.Ct. 1899. The question, therefore, is whether there is fair support in the record for the state court's conclusion that a juror will be impartial. *Patton,* 467 U.S. at 1038, 104 S.Ct. 2885. Indeed, even if a juror initially is ambiguous and equivocal in his answers, the trial judge may still properly determine the juror's credibility if he ultimately states he will be fair because "under our system it is [the] judge who is best situated to determine competency to serve impartially." *Id.* at 1039, 104 S.Ct. 2885.

At the same time, the juror's assurances that he is equal to his task cannot be dispositive of a criminal defendant's rights. *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). "[I]t remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Id.* (citation omitted). Additionally, when reviewing a potential juror's statements during voir dire, the Court must keep in mind whether the statement was made in answer to a leading question from defendant's counsel and whether the juror made other statements indicating that

he had no deep impression of Petitioner at all. *Id.* at 802, 95 S.Ct. 2031.

■■■ John Friedel admitted to reading about the murder when it happened. 2/13 V.D. at 90–91. He was asked whether he thought justice was done when Petitioner was previously convicted. He responded that at the time he thought justice had been done. *Id.* at 93. Although he admitted that he would think about the prior jury finding, he would not let it affect his thinking. *Id.* at 95. In addition, Friedel answered yes to questions of whether he would give Michael Quartararo a "fair shake" and would only use the facts presented to him. *Id.* at 96. Finally, Friedel was asked whether the exclusion of some evidence would affect his decision. He replied that he could not guarantee anything, but he would try to be objective. *Id.* at 110. He later stated that he would base his decision on what was presented. *Id.* at 111.

Admittedly, the decision to seat Friedel was a difficult one for the trial judge. *Id.* at 115. However, the Court agrees with the trial judge that despite some initially questionable statements by Friedel, the totality of his responses indicates that he was not actually prejudiced, and was willing to lay aside his opinions about the case in order to render an impartial verdict. He responded that he would keep an open mind throughout the proceeding, and perhaps most compelling, he responded "yes" twice to a question of whether he would base his decision on the facts presented in the case before him. *Id.* at 96, 99, 111.

In asserting a claim of actual prejudice, Petitioner places great emphasis on the trial judge's own "equivocal" decision and his recognition that the decision whether to excuse Friedel was a "tough call." However, merely because the decision was a difficult one does not render the decision any more suspect or susceptible to a finding of manifest error. Indeed, the contrary may be said because the most difficult decisions are often the ones given the most thought and consideration of the possible ramifications.

The Court also disagrees with Petitioner that the record "conclusively demonstrates that the trial court erred when it found that Friedel could serve as a fair and impartial juror." Pet. Mem., at 48. The trial court's decision reflected Judge Mallon's assessment of Friedel's credibility when he assured the defense (and the prosecution) that he could be fair and impartial. Although a general statement that a juror will be fair and impartial is not determinative, *Irvin*, 366 U.S. at 728, 81 S.Ct. 1639, Friedel's statements are supported in his responses, notwithstanding his early admission that he felt justice had been done. Therefore, the Court finds Petitioner's claims of actual juror prejudice to be without merit.

### *CONCLUSION*

For the foregoing reasons, Michael Quartararo's petition for a writ of habeas corpus is DENIED on the claim that his confrontation clause rights were violated. The petition also is DENIED on the claim that his trial should have been transferred out of Suffolk County, and on the claim of actual juror prejudice. However, the petition is GRANTED on the due process claim, the Court having determined that the evidence presented at trial was constitutionally insufficient to support Petitioner's conviction for intentional murder.

The Respondent is ORDERED to release Petitioner and dismiss the indictment within twenty days of this order. This order is stayed pending appeal on the condition that, within seven days of the date of this order, Respondent files a notice of appeal and a motion for an expedited schedule for the prosecution of the appeal.

SO ORDERED.